MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
& another *vs.* A. J. COLANGELO & another.

Middlesex.    January 4, 1962. — May 16, 1962.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, CUTTER,
KIRK, & SPIEGEL, JJ.

*Anti-Discrimination Law. Constitutional Law,* Anti-discrimination law,
Due process of law, Police power, Taking of property, Who may ques-
tion constitutionality, Freedom of contract. *Eminent Domain,* What
constitutes taking. *Equity Pleading and Practice,* Proceeding to enforce
anti-discrimination order.

Statement of certain general principles governing judicial review of the
constitutionality of a statute.   [390–391]
Enforcement of the provisions of G. L. c. 151B, § 4, subsection 6, as
amended through St. 1959, c. 239, § 2, against the owner of a large
apartment building, privately financed without public assistance, would
not result in a taking of his property in the constitutional sense.   [391–
392]   KIRK, J., dissenting.
There was no merit in a contention by the rental agent of a large apart-
ment building, privately financed without public assistance, that enforce-
ment of the provisions of G. L. c. 151B, § 4, subsection 6, as amended
through St. 1959, c. 239, § 2, against him would constitute an infringe-
ment of his alleged "freedom of association" and "freedom from coer-
cion."   [392]
Absence of express legislative findings supporting valid objectives for the
enactment of a statute in exercise of the police power was immaterial
where such findings could have been made by the General Court.   [393]
Adequate findings supporting valid objectives for the enactment of the
provisions of G. L. c. 151B, § 4, subsection 6, as amended through
St. 1959, c. 239, § 2, could have been made by the General Court.
[393–394]
The provisions of G. L. c. 151B, § 4, subsection 6, as amended through
St. 1959, c. 239, § 2, as applied to the owner and rental agent of a large
apartment building, privately financed without public assistance, did not
interfere with their right of "acquiring, possessing, and protecting"
property in violation of art. 1 of the Declaration of Rights of the Massa-
chusetts Constitution or deprive them of property without due process
of law in violation of the Fourteenth Amendment to the Constitution of
the United States, and were a valid exercise of the police power.   [394–
395]   KIRK, J., dissenting.
In a proceeding under G. L. c. 151B, § 6, by the Massachusetts Commis-
sion Against Discrimination against the owner and rental agent of an

apartment building to enforce an order made by the commission under § 5 after finding that the respondents, within § 4, subsection 6, had engaged in an unlawful discriminatory practice by refusing to rent an apartment in the building to the complainant before the commission, a Negro, because of his color, this court directed entry of a decree enforcing certain paragraphs of the order which, in substance, required the respondents to cease withholding an apartment from the complainant and to offer to lease, and, upon acceptance of the offer, to lease, to him an apartment of the kind sought by him at the advertised rent therefor and upon terms and conditions similar to those of the leases of other apartments; but a provision of such paragraphs requiring that the complainant be "accorded substantially the same privileges, services, benefits and rental concessions accorded to the most favored tenant or tenants in" the building must be eliminated. [399–401] SPIEGEL, J., favored enforcement also of further paragraphs of the order requiring the respondents generally to desist from considering race, creed, color or national origin in connection with renting apartments in the building. [402–403]

In the circumstances, in a proceeding under G. L. c. 151B, § 6, by the Massachusetts Commission Against Discrimination to enforce an order by it under § 5 dealing with unlawful discriminatory practices, this court on report, after directing the entry of a decree enforcing certain paragraphs of the order, provided an opportunity for a limited time to the respondents to move in this court for recommittal to the commission for further consideration of specific issues raised by the remaining paragraphs of the order and directed that, if no such motion were filed, a supplementary decree should be entered enforcing the remaining paragraphs. [401]

PETITION filed in the Superior Court on March 21, 1961.

The case was reported, without decision, by *O'Connell,* J.

*Edward J. McCormack, Jr.,* Attorney General, *Albert M. Sacks,* Special Assistant Attorney General, & *Gerald A. Berlin,* Assistant Attorney General, for Massachusetts Commission Against Discrimination.

*Edward J. Barshak* for Fowler.

*Walter H. McLaughlin* (*Walter H. McLaughlin, Jr.* & *Arthur M. Gilman* with him) for Nahigian.

*Richard C. Evarts* (*J. Laurence McCarthy* with him) for Colangelo.

*Laurence S. Locke* & *Norman Landstrom,* by leave of court, submitted a brief as amici curiae.

WILKINS, C.J.   The petitioner commission, established pursuant to G. L. c. 6, § 56 (as amended through St. 1951,

c. 588), brings this petition to enforce an order the commission entered against the respondents, Colangelo and Nahigian, respectively the owner and rental agent of a new 120-unit apartment building[1] in Waltham known as Glenmeadow Apartments. G. L. c. 151B, § 6, as amended through St. 1957, c. 426, § 5. The premises are privately financed, with no governmental guaranty, insurance, or other public assistance. The case is reported without decision by a judge of the Superior Court for our determination upon the pleadings, a statement of agreed facts, and a transcript of the hearing before the commission. G. L. (Ter. Ed.) c. 214, § 31.

Maurice Fowler, the complainant in proceedings before the commission under G. L. c. 151B, § 5 (as amended through St. 1957, c. 426, § 4; see now St. 1961, c. 570), has been allowed to intervene as a party petitioner. He is a Negro employed as a contract negotiator for the Electronics System Center of the United States Air Force located at Waltham, and is seeking to rent one of the apartments at the advertised rental of $145 a month. On July 20, 1960, he filed a written complaint with the commission charging the respondents with unlawful discriminatory practices. The commission conducted a preliminary investigation, followed by an unsuccessful attempt at conference, conciliation, and persuasion. After a formal hearing under § 5 the commission found that the respondents had engaged in unlawful discriminatory practices as defined in § 4, as amended, in refusing to rent an apartment to Fowler because of his color. Other findings were that he had obtained comparable accommodations in Cambridge at $175 a month. The commission also entered an order which, among other things, directed the respondents to make an apartment available to Fowler, to compensate him for the damages suffered because of the discrimination, and to cease discrimination in renting apartments.

The statutory provisions pertinent to the case at bar are G. L. c. 151B, § 4, inserted by St. 1946, c. 368, § 4 (as

---

[1] The findings of the commission give the number of units as 110. The figure appears as 120 in the answer of Colangelo filed with the commission and in all the briefs.

amended through St. 1959, c. 239, § 2)[1]: "It shall be an unlawful practice: . . . [subsection] 6. For the owner, lessee, sublessee, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other person having the right of ownership or possession or right to rent or lease such accommodations: — (a) to refuse to rent or lease or otherwise to deny to or withhold from any person or group of persons such accommodations because of the race, creed, color or national origin of such person or persons; (b) to discriminate against any person because of his race, creed, color or national origin in the terms, conditions or privileges of such accommodations or in the furnishing of facilities or services in connection therewith . . . ."

In c. 151B, § 1, cl. 11, inserted by St. 1957, c. 426, § 1, we read the definition, "The term 'multiple dwelling' means a dwelling which is usually occupied for permanent residence purposes and which is either rented, leased, let or hired out, to be occupied as the residence or home of three or more families living independently of each other. . . ."

The principal reliance of each respondent is upon constitutional objections to these statutory provisions. Before trying to analyze those objections certain general principles should be clearly noted. "It is only when a legislative finding cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it that a court is empowered to strike it down. . . . If the question is fairly debatable, courts cannot substitute their judgment for that of the Legislature." *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 138–139, and cases cited. *Wright* v. *Peabody,* 331 Mass. 161, 164. *Commonwealth* v. *Chamberlain,* 343 Mass. 49, 51. Only one whose rights are impaired by a statute can raise the question of its constitutionality, and he can object to the statute only as applied to him. *Commonwealth* v. *Brown,* 302 Mass. 523, 526, app. dism. 308 U. S. 504. *Kaplan* v. *Bowker,* 333 Mass. 455,

---

[1] Later amended by St. 1960, c. 163, § 2, and St. 1961, c. 128.

459–461.  *Silverman* v. *Board of Registration in Optom-etry, ante,* 129, 135.  *Yazoo & Miss. Valley R.R.* v. *Jackson Vinegar Co.* 226 U. S. 217.  *Gorieb* v. *Fox,* 274 U. S. 603, 606.  *United States* v. *Raines,* 362 U. S. 17, 20–24. See *Broadhurst* v. *Fall River,* 278 Mass. 167, 170.  The burden of overcoming the presumption of constitutionality is not sustained by generalities whether of law or fact.  Specific allegations are required.  *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 319 Mass. 301, 305. *Commonwealth* v. *Chamberlain, supra,* page 52.

In attacking the statutory provision quoted above prohibiting discrimination because of "race, creed, color or national origin" in renting or leasing accommodations in multiple dwellings as there defined, the respondent Colangelo relies upon the due process clause of the Fourteenth Amendment to the Constitution of the United States and arts. 1 and 10 of the Declaration of Rights in the Constitution of this Commonwealth.  He contends that there has been an invasion of his right of "acquiring, possessing, and protecting property," and of his right of liberty of contract, and that there has been an appropriation of his property without compensation.  The respondent Nahigian claims infringements on his freedom to contract with persons he chooses, on his "freedom of association," and on his "freedom from coercion," basing his claims upon art. 1 of the Declaration of Rights and on Part II, c. 1, § 1, art. 4, of the Constitution of this Commonwealth.  He also cites arts. 10 and 12 of the Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States.

1. Several contentions may be briefly disposed of.  A suggestion of the respondent Colangelo is that there has been a taking of his property without compensation in violation of art. 10 of the Declaration of Rights.  No attempt has been made to allege or prove specific damage or reduction in property value.  All that this respondent says is that the "freedom of the owner to exercise his own judgment in the sale or rental of his property is the most important attribute of ownership," and that to the extent that

St. 1959, c. 239, takes that right there has been a confiscation of an interest in property by the State. Clearly there has been no taking of property in a constitutional sense. *Commonwealth* v. *Alger,* 7 Cush. 53, 84–88. *Locatelli* v. *Medford,* 287 Mass. 560, cert. den. 294 U. S. 727. *Opinion of the Justices,* 333 Mass. 773, 777.

The respondent Nahigian is in no position to contend that there has been an infringement of his freedom of association. Whatever may be said of the right of a home owner freely to choose his neighbors or to rent only to persons of his own choice, Nahigian is merely the rental agent of a 120-unit apartment house. He is not being compelled to live near anyone by the commission's order, and he lacks standing to raise the rights of others. In answer to his argument that there has been an interference with his right to freedom from coercion, we need only indicate that in running his realty business, he is not exempt from State regulation. See, for example, G. L. c. 112, §§ 87PP–87DDD (inserted by St. 1957, c. 726, § 2), as amended. See also *Seaman* v. *Zoning Bd. of Appeals of Holliston,* 340 Mass. 488, 489; *Ranke* v. *Corporation & Sec. Commn.* 317 Mich. 304, 310; *Roman* v. *Lobe,* 243 N. Y. 51, 54–57; *Payne* v. *Volkman,* 183 Wis. 412, 419. Two cases relied upon are of no material bearing. *Cantwell* v. *Connecticut,* 310 U. S. 296, dealing with the free exercise of one's religion, and *West Va. State Bd. of Educ.* v. *Barnette,* 319 U. S. 624, concerning State compelled affirmations of belief, do not give the respondent an absolute constitutional right to implement his beliefs or prejudices by any conduct he chooses.

2. The major argument of the respondent Colangelo, as it appears to us, is that there has been an invasion of his rights in property and of his right of liberty to contract in violation of Part II, c. 1, § 1, art. 4, of the Constitution of this Commonwealth. This provision confers upon the General Court "full power and authority . . . to make, ordain, and establish, all manner of wholesome and reasonable . . . laws, statutes . . . so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the

good and welfare of this Commonwealth, and for the government and ordering thereof . . . .'' Article 1 of the Declaration of Rights defines as one of the ''natural, essential, and unalienable rights . . . that of acquiring, possessing, and protecting property.''

(a) The respondents have shown nothing to rebut the presumption of valid statutory objectives. The respondent Colangelo complains that there are no express legislative findings as to the relationship, if any, of the amendment, inserted by St. 1959, c. 239, to the public health, safety, morals or welfare. But there need be no such express findings. As was said in *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 319 Mass. 301, 304–305, ''The Legislature possesses a large measure of discretion to determine what the public interests require and what means should be taken to protect those interests. The field for the legitimate exercise of the police power is coextensive with the changing needs of society. The record does not negative the existence of any of the possible findings . . . .''

We reject the contention that the ''only discernible purpose of the statute is to make people live together in a certain pattern of color.'' There are a number of possible findings which, in enacting the statute, the Legislature could have made in the legitimate exercise of the police power within the rule laid down in the *Merit Oil Co.* case. The respondent Colangelo concedes that the relationship to the public health and safety of statutes prohibiting discrimination because of race or color in employment and in places of public accommodation is not so remote as to be irrational (*Bryant* v. *Rich's Grill,* 216 Mass. 344; *Opinion of the Justices,* 247 Mass. 589, 595); and that such ''discrimination because of race or color in the rental of publicly assisted housing accommodations has a real, though somewhat tenuous, relation to action by the State.'' As to possible objectives, there is no constitutional distinction between legislating in these areas and legislating in the field of multiple-dwelling housing. This is apart from questions of constitutionality raised in implementing these ob-

jectives because of the degree of interference with private property rights.    These are discussed below.

We enumerate certain possible findings which the Legislature could have made to support valid objectives.    These are not necessarily a complete list.    (1) Discrimination in multiple dwelling and contiguously located housing might tend to restrict Negroes to a relatively small area and perhaps to encourage slum conditions through density of population.    See *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288, 293–294; *Papadinis* v. *Somerville,* 331 Mass. 627, 631; *Opinion of the Justices,* 334 Mass. 760, 763. (2) Housing discrimination could impede the relocation of families affected by urban redevelopment programs.    See *Allydonn Realty Corp.* v. *Holyoke Housing Authy. supra,* 295 (low cost housing to aid relocation) ; *Papadinis* v. *Somerville, supra,* 633–634 (prohibition on use of cleared land for residential purposes) ; *Bowker* v. *Worcester,* 334 Mass. 422, 426 (relocation plan).    (3) There might be a shortage in housing from which Negroes could suffer more than other groups.    See *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 507.  We cannot say that such possible legislative beliefs were "so irrational that none of these objects would result from the passage of the act."    *Supreme Malt Prod. Co. Inc.* v. *Alcoholic Beverages Control Commn.* 334 Mass. 59, 62.    See *Howes Bros. Co.* v. *Unemployment Compensation Commn.* 296 Mass. 275, 283–284.

(b) We now come to a determination whether the means used to implement permissible statutory objectives constitute, as to these respondents, an interference with their rights of "acquiring, possessing, and protecting property" to an unreasonable degree so as to constitute an impermissible method of accomplishing those objectives.    As earlier noted, the respondents have neither alleged nor attempted to prove any financial loss.    The harm they allege is an invasion of their freedom to deal with their property as they wish, including their "liberty of contract."    See *Commonwealth* v. *Perry,* 155 Mass. 117, 121; *Opinion of the Justices,* 267 Mass. 607, 610.    Compare *Opinion of the Justices,* 337

Mass. 796, 798–799. A more precise statement would be that the respondents, one as owner and one as the owner's agent, are complaining about a restriction upon the ability of each to deal with the respondent Colangelo's property.

As to these respondents, we do not observe an exceeding of the limits of the police power under Part II, c. 1, § 1, art. 4, which results in a violation of art. 1 of the Declaration of Rights or in a deprivation of property without due process of law under the Fourteenth Amendment. As to them, the statutory regulation falls within the established principle that "neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest." *Nebbia* v. *New York,* 291 U. S. 502, 523. See *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421; *Commonwealth* v. *Libbey,* 216 Mass. 356, 357–358; *Spector* v. *Building Inspector of Milton,* 250 Mass. 63, 70; *Paquette* v. *Fall River,* 338 Mass. 368, 375–376.

The impact of G. L. c. 151B, § 4, upon the respondents we are unable to distinguish on constitutional grounds from analogous situations where statutes prohibiting discrimination have been upheld. (1) Places of public accommodation, resort, and amusement. *Bryant* v. *Rich's Grill,* 216 Mass. 344, 347–348 (constitutionality not questioned). *Crawford* v. *Robert L. Kent, Inc.* 341 Mass. 125 (constitutionality not questioned). See *Opinion of the Justices,* 247 Mass. 589, 595. In other States to the same effect, see *Darius* v. *Apostolos,* 68 Colo. 323, 330 (shoe shine shop); *Pickett* v. *Kuchan,* 323 Ill. 138, 141 (theatre); *Bolden* v. *Grand Rapids Operating Corp.* 239 Mich. 318, 323 (theatre); *Rhone* v. *Loomis,* 74 Minn. 200, 203 (saloon); *Messenger* v. *State,* 25 Neb. 674, 677 (barber shop); *People* v. *King,* 110 N. Y. 418, 424–428 (roller skating rink). There is no Federal constitutional problem. *District of Columbia* v. *John R. Thompson Co. Inc.* 346 U. S. 100, 109. (2) Private em-

ployment. *Highland Park* v. *Fair Employment Practices Commn.* 364 Mich. 508, 514–518. *Holland* v. *Edwards,* 307 N. Y. 38 (constitutionality not questioned). *Ross* v. *Arbury,* 206 Misc. (N. Y.) 74 (constitutionality not questioned), affd. 285 App. Div. (N. Y.) 886. (3) Union membership or privileges. *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88, 93–94.

Cases upholding restrictions upon the free and most profitable use of real estate are persuasive by way of analogy. (1) Zoning. *Spector* v. *Building Inspector of Milton,* 250 Mass. 63, 68–70. *Simon* v. *Needham,* 311 Mass. 560, 565. *Lamarre* v. *Commissioner of Pub. Works of Fall River,* 324 Mass. 542, 545. *Euclid* v. *Ambler Realty Co.* 272 U. S. 365, 386–395. (2) Compelled remodeling. *Paquette* v. *Fall River,* 338 Mass. 368. *Queenside Hills Realty Co. Inc.* v. *Saxl,* 328 U. S. 80, 82–83. (3) Historic districts. *Opinion of the Justices,* 333 Mass. 773.

Perhaps the most persuasive analogy is in the field of rent control. In *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 507–508, we upheld a rent control statute designed to relieve a housing shortage. Cases in the Supreme Court of the United States upholding similar statutory limitations upon what rents landlords could charge tenants are *Block* v. *Hirsh,* 256 U. S. 135, 155–158, *Marcus Brown Holding Co. Inc.* v. *Feldman,* 256 U. S. 170, 198, *Edgar A. Levy Leasing Co. Inc.* v. *Siegel,* 258 U. S. 242, 246–248. See *Bowles* v. *Willingham,* 321 U. S. 503, 516–519. These cases, to be sure, dealt with rent controls which were temporary but so were the housing shortages.

Statutes prohibiting discrimination in publicly assisted housing were upheld against charges of being a denial of the equal protection of the laws in *Levitt & Sons, Inc.* v. *Division Against Discrimination in the State Dept. of Educ.* 31 N. J. 514, 532–534, app. dism. 363 U. S. 418, in *Burks* v. *Poppy Constr. Co.* 57 Cal. 2d 463, 474–475, and in *Hudson* v. *Nixon,* 57 Cal. 2d 482, 483. The court in the *Levitt* case intimated (page 531) that a contention that there was a want of due process likewise would have failed. In *New*

*York State Commn. Against Discrimination* v. *Pelham Hall Apartments, Inc.* 10 Misc. 2d (N. Y.) 334, 340–342, a prohibition of discrimination as to rentals in publicly assisted housing was upheld as properly within the police power and as not an unconstitutional deprivation of property. In *O'Meara* v. *Washington State Bd. Against Discrimination,* 58 Wash. 2d 793, cert. den. 369 U. S. 839, a statute prohibiting discrimination was invalidated, by a five to four vote, as a denial of equal protection because limited to publicly assisted housing. The minority would have sustained the constitutionality of the statute on all grounds, and three of the majority intimated that but for the unreasonable classification, the statute would have been valid.

The respondents seem to accept that the cases upholding anti-discrimination statutes are based upon sound constitutional principles. The respondent Colangelo concedes that the "rent control cases are closer to the case at bar," and that "discrimination because of race or color in the rental of publicly assisted housing accommodations has a real, though somewhat tenuous relation to action by the State." The respondent Nahigian argues that anyone accepting government assistance, such as the Federal Housing Administration and the Veterans' Administration, must do so on the government's terms and conditions.

No part of G. L. c. 151B is a condition imposed by the Federal Housing Administration or the Veterans' Administration. The problem we are considering at this point is whether this Commonwealth may legislate for valid objectives by imposing these restrictions on the freedom of these respondents in choosing tenants for their privately financed multiple dwelling.

If the cases upholding anti-discrimination statutes are soundly decided, as we believe they are, there is no valid distinction on constitutional grounds from the case at bar. The lack of public assistance to the respondents' apartment house is not of crucial significance. The cases of *Burks* v. *Poppy Constr. Co.* 57 Cal. 2d 463, 471, *Lee* v. *O'Hara,* 57 Cal. 2d 476, 478, *Vargas* v. *Hampson,* 57 Cal. 2d 479, 481, and *Martin* v. *New York,* 22 Misc. 2d (N. Y.) 389, have so

held.   The California court upheld the application of a statute prohibiting discrimination in "all business establishments" to the owners and sellers of a tract of houses, and to real estate brokers.

Section 4, subsection 6, is really aimed at preventing discrimination in the business of housing.   In its application to privately financed multiple dwelling and contiguously located housing accommodations, the statute seeks to reach leasing and selling when conducted as a business.   As related to these respondents there is regulation of the 120-unit housing operation, which has not been shown to be substantially burdensome.   The statute is in pattern with other anti-discrimination legislation.   General Laws c. 272, § 92A (as amended through St. 1953, c. 437), and § 98 (as amended through St. 1950, c. 479, § 3) apply in "A place of public accommodation, resort or amusement . . . [which] shall be deemed to include any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public . . . ."   Specifically enumerated are, among others, hotels, resorts, public carriers, garages, retail stores, restaurants, rest rooms, theatres, and hospitals run for a profit.

3.   We next give attention to the findings and order. General Laws c. 151B, § 6 (as amended through St. 1957, c. 426, § 5), reads in part: "No objection that has not been urged before the commission shall be considered by the [superior] court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."   No issue as to the findings and the order was raised before the commission.   Counsel for each respondent chose to be present at the hearing solely to test constitutionality and did not interrogate the witnesses.   Following the filing of the findings and order they took no action before the commission.

Under an identical statutory provision, the New York Court of Appeals held that objections to an order not advanced until after the agency sought judicial enforcement of its order came too late.   *Holland* v. *Edwards,* 307 N. Y. 38, 45–46.   See, to the same effect, *May Dept. Stores Co.* v.

*National Labor Relations Bd.* 326 U. S. 376, 386n; *National Labor Relations Bd.* v. *Cheney Calif. Lumber Co.* 327 U. S. 385, 388–389; *National Labor Relations Bd.* v. *Seven-Up Bottling Co. of Miami, Inc.* 344 U. S. 344, 350. In the disposition we make of this case we do not follow the procedure of the cited cases in the present circumstances. In subsequent cases, however, the parties will be on notice from this opinion, as well as from the statute, that they should raise before the commission any issues which they intend to present upon a judicial review of the commission's decision.

The respondent Colangelo does not question the findings and the order in his answer to the enforcement petition. The respondent Nahigian alleges that both the findings and the order are, as to him, in excess of the statutory authority of the commission and are unlawful and null and void; and that the "order is arbitrary, capricious, constitutes an abuse of discretion and is otherwise not in accordance with the provisions of c. 151B."

In his brief the respondent Colangelo argues that the order is void and should not be enforced, and that the findings are not supported by substantial evidence as required by G. L. c. 30A, § 14 (8) (e). He cites art. 15 of the Declaration of Rights. The respondent Nahigian in his brief argues that portions of the order are invalid and should not be enforced. It is at least doubtful whether he could, in any event, raise certain of these points on his own behalf although the respondent Colangelo might do so, since the impact of most of the order's provisions upon the respondent Nahigian is only in his capacity as agent for Colangelo.

Not all these issues have been argued with sufficient definiteness to be a compliance with Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 698. Many terms of the order vitally affect the rights of the respondents and will continue to do so for some time to come. On the issue of discrimination, however, the finding is clearly supported by substantial evidence.

Under the terms of the report we are in the same position as was the Superior Court at the time of the filing of the enforcement petition. G. L. c. 151B, § 6, c. 214, § 31. This

includes the power "to make and enter . . . an order or
decree enforcing, modifying, and enforcing as so modified,
or setting aside in whole or in part the order of the commis-
sion . . . ." G. L. c. 151B, § 6. The section just cited
allows any party to move "to remit the case to the commis-
sion in the interests of justice for the purpose of adducing
additional specified and material evidence and seeking find-
ings thereon, provided he shows reasonable grounds for the
failure to adduce such evidence before the commission."

Section 6 also provides, "The order or decision of the
commission shall be reviewed in accordance with the stand-
ards for review provided in paragraph (8) of section four-
teen of chapter thirty A." Section 14 allows remand to
the agency in certain circumstances, for example, where
the substantial rights of a party may have been prejudiced
or where the agency decision is in excess of statutory
authority.

This being the first case of its kind to reach this court,
it would be unfortunate if certain features of the order,
which may become standard, should be established by de-
fault. Various parts of the order raise doubts whether the
commission has not in some respects exceeded its authority
by imposing requirements upon the respondents which seem
particularly extreme in a case of first impression where the
basic issue is one of the general constitutionality of the stat-
ute. Accordingly, in the interests of justice and of a help-
ful presentation of similar cases in the future, we shall deal
with the order in the following manner.

Paragraphs 1 (a) and 2 (a) of the order[1] are properly

---

[1] "Upon the basis of the foregoing Findings of Fact and pursuant to § 5,
c. 151B, of the General Laws of Massachusetts, it is hereby ordered, by the
Massachusetts Commission Against Discrimination that the respondents A. J.
Colangelo and John Nahigian, their agents, servants, employees, assigns and
successors shall:

"1. Cease and desist from:

"a. Denying to and withholding from complainant, Maurice Fowler, an
apartment, together with the privileges and services and facilities relating
thereto, at premises 1105 Lexington Street, Waltham, Massachusetts, known
(and herein and after referred to) as Glenmeadow Apartments, . . .

"2. Take the following affirmative action, which in the judgment of the
Massachusetts Commission Against Discrimination, will effectuate the Massa-
chusetts Fair Housing Practices Law:

enforceable except for the reference (set out in the footnote in supplied italics) to "the most favored tenant or tenants" in paragraph 2 (a) (ii). A definite prohibition of discrimination against the intervener is what the statute authorizes. The "most favored" reference is unnecessarily vague, is not limited to tenants occupying $145 accommodations, and could lead to controversy in enforcement. The italicized clause should be eliminated from paragraph 2 (a) (ii).

With respect to the remaining paragraphs of the order other than paragraph 1 (a) and paragraph 2 (a), if either or both of the respondents within seven days from the date of the rescript file a motion or motions with this court asking that the case be recommitted to the commission for further proceedings relating to certain specific issues raised by the remaining paragraphs, we shall make a further direction.

A decree is to be entered enforcing paragraphs 1 (a) and 2 (a) of the commission's order, but with the "most favored tenant" clause eliminated. If no motion respecting the remaining paragraphs of the order be filed as above provided, a supplementary decree is to be entered enforcing the remaining paragraphs.

*So ordered.*

---

"a. With respect to the housing accommodations sought by complainant:

"(i) Set aside for, and offer to lease forthwith to, the complainant, the leasing period to commence at such time as the complainant can conveniently terminate or satisfactorily modify his present rental arrangements, an apartment of the type for which he applied at Glenmeadow Apartments or a substantially similar apartment, at a rental of $145 per month, for a period of not less than two years from the date of the right to occupancy under the lease. The complainant shall have a reasonable period of time to accept or reject said offer to lease.

"(ii) If the complainant accepts such offer to lease, the respondents shall execute a written lease of the apartment to the complainant within five (5) days after receipt of written notice of such acceptance. The terms and conditions of such lease shall be substantially similar to the terms and conditions of leases executed by tenants of other apartments at Glenmeadow Apartments during the period August 1, 1960, to December 31, 1960; *and the complainant shall be accorded substantially the same privileges, services, benefits and rental concessions accorded to the most favored tenant or tenants in Glenmeadow Apartments, whether such privileges, services, benefits or rental concessions have been granted by terms of lease or otherwise to such tenant or tenants.*

"(iii) If the complainant accepts the apartment and executes a lease therefor as aforesaid, respondents shall make said apartment available to the complainant fully ready for occupancy within ten (10) days after the execution of the lease, or at such other reasonable time as the complainant shall request. . . ."

SPIEGEL, J. The majority opinion sets forth a sound legal basis for upholding the constitutionality of the fair housing practices law (G. L. c. 151B) as it relates to privately owned multiple dwellings. With this interpretation of the statute I am in complete accord. I cannot, however, agree with the limitation of the order of the commission which the court imposed.

There is no doubt that the respondents were engaged in unlawful discrimination against the intervener. The court held that "[o]n the issue of discrimination . . . the finding is clearly supported by substantial evidence."

The testimony at the hearing before the commission is overwhelming as to the discrimination practised by the respondents against the intervener. The record also reveals the flimsy pretexts resorted to by the respondents to conceal their practice of discrimination. The pretences used by them to cloak their real intentions are hardly conducive to the belief that other prospective tenants would not be subjected to similar tactics.

I readily concede that legislation, in and of itself, cannot eradicate bias and prejudice from the minds of men. It may be argued that discrimination in the selection of tenants for a multiple dwelling is not an indication of personal bias on the part of a landlord. In my view, however, discrimination based on the hope of monetary gain and not upon a personal prejudice is even more reprehensible. In either event, I find no rational excuse for such behavior.

When a person acts so as to create a "second class" of citizens, then the injunctive provisions of the law to prevent a recurrence of such a classification should be applied to the fullest extent.

Because this is a case of first impression does not appear to me to be a sufficient reason for the court's hesitancy in enforcing paragraphs 1 (b) and 2 (b) of the order of the commission which require the respondents to cease and desist from "[g]iving consideration to the factors of race, creed, color or national origin in seeking and handling applications for apartments at Glenmeadow Apartments, in

making inquiry as to the qualifications for tenancy of applicants for apartments at Glenmeadow Apartments, in passing upon such qualifications and in accepting or rejecting said applicants, in negotiating for and executing leases at Glenmeadow Apartments and in giving occupancy to tenants at Glenmeadow Apartments, and in the conditions and privileges of tenancy at Glenmeadow Apartments and in the furnishing of facilities or services in connection therewith'' (paragraph 1 [b]), and to ''[a]pply the same standards of evaluation to all applicants for apartments at Glenmeadow Apartments, without regard to race, creed, color or national origin'' (paragraph 2 [b]).

These paragraphs of the commission's order are neither arbitrary nor unreasonable. They are necessary to secure full compliance with the provisions of the statute. See *International Salt Co. Inc.* v. *United States,* 332 U. S. 392, 400; *Federal Trade Comm.* v. *National Lead Co.* 352 U. S. 419, 429–430.

It is my belief that the commission was thoroughly justified in refusing to give the respondents another chance to engage in an illegal act or acts of discrimination against others without taking the risk of being found guilty of contempt.

In addition to those paragraphs of the order of the commission enforced by the court, I would enforce paragraphs 1 (b) and 2 (b) quoted above.

KIRK, J. I cannot in conscience accede to the views of my esteemed colleagues. At the same time I doubt if any useful purpose would now be served by a lengthy dissent, or by pointing out what I deem to be the frailties and the fallacies of the majority opinion. The opinion provides, I respectfully suggest, a fragile platform for this 'great leap forward.'

The banishment of discrimination because of race, creed, color or national origin is a wholly desirable moral and social objective. The objective has been pursued vigorously and relentlessly. Voluntary private associations have labored for it. The religious have preached and

strived for it. The expenditures of vast sums of public funds for various public purposes at all echelons of government have been made subject to it. Regulatory and licensing powers over private business enterprises which cater to the transient and casual conveniences or desires of the public at large have been exercised to promote it. The results of these and other efforts have yet to be measured and made known.

And now, indeed by a six-word amendment,[1] purely private property lies exposed to the full impact of the drive. It should give us pause.

The subject of the legislation is the owner (or the person in control) of purely private property which is to be used as a home for three or more families (a "family" may consist of one person living alone, G. L. c. 151B, § 1, cl. 11). The effect, if not the object of the legislation, under the shibboleth of anti-discrimination, is to authorize a public body to determine who shall occupy the privately owned premises and to apply sanctions for disobedience to its determination. This is, I respectfully submit, a deprivation of one of the essential attributes of ownership and an invasion of a constitutionally protected interest to an extent which has never before been attempted in this Commonwealth.

I firmly believe that such a deep invasion of rights in purely privately owned property for residence purposes is repugnant to, and cannot stand in conflict with, the "natural, essential, and unalienable rights . . . of acquiring, possessing, and protecting property" recognized and protected by art. 1 of the Declaration of Rights.

The court has, nevertheless, given its approval to the legislation without the slightest showing which would justify it even temporarily or on an emergency basis. Surely this court as the guardian of our Constitution should require more than mere legislative fiat before countenancing legislation of this character. The bare exercise of the police power by the Legislature should not, ipso facto, be

---

[1] St. 1959, c. 239, § 2.

held to constitute, in all cases, a legitimate exercise thereof. Thus to hold would drain the constitutional restraints of their vitality. However, in context, the fair implication of the majority opinion is that the legislative act is conclusive.

It is also my firm conviction that the degree of interference authorized by the statute constitutes an appropriation for a public purpose of the owner's property without his consent, with no showing that "the public exigencies require" it, and for which the owner has received no compensation whatsoever. This is in direct violation of art. 10 of the Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States.

Finally, the commission in its order has resorted to coercive measures[2] which I think are per se both alien and

---

[2] The commission's order to the respondents, quoted in part in the footnote of the majority opinion, continues as follows in paragraph 2:

"c. Issue written instructions in a form satisfactory to the Commission to all agents, servants and employees of Glenmeadow Apartments and Auburndale Realty, and to all other persons now engaged or employed, or who may hereafter be employed or engaged within one year of the date of this order by the respondents, explaining the requirements and objectives of the Massachusetts Fair Housing Practices Law and advising each such person of his individual responsibility for compliance with the Massachusetts Fair Housing Practices Law and his obligation to make such compliance meaningful and effective. Copies of such instructions signed by the said persons individually and acknowledging receipt and understanding thereof shall be transmitted to the Commission by the respondents.

"d. Post the Commission Notice conspicuously in easily accessible and well-lighted places at Glenmeadow Apartments, where it may be readily observed by those seeking housing accommodations or facilities or services in connection therewith.

"e. Transmit to the Commission forthwith a statement listing each of the apartments at Glenmeadow Apartments, which on the date of this order, was not rented or leased, giving the designation of the apartment, the number of rooms and the rental being asked.

"f. Include forthwith in their usual advertising media for the next ninety (90) days in all advertisements for Glenmeadow Apartments including newspaper, brochure, pamphlet, booklet, sign or otherwise, a separate statement in bold type couched in a form satisfactory to the Commission giving notice that Gleanmeadow Apartments are subject to the Massachusetts Fair Housing Practices Law and that the apartments therein are available for rental without reference to race, creed, color or national origin.

"g. Compensate the complainant in full for the following monetary damages incurred by him on account of the respondent's discrimination:

"(i) The difference between the rental for an apartment at Gleanmeadow Apartments and the rental he paid to live elsewhere from November 1, 1960, to March 1, 1961, or to such other date as the complainant may conveniently occupy an apartment in Gleanmeadow Apartments, whichever date comes first.

"(ii) In the event the complainant accepts a lease at Glenmeadow Apartments, the cost of moving his furniture from his present residence to Glenmeadow Apartments.

inimical to the letter, the spirit and the principles of the Constitutions of our Commonwealth and our country. I would so hold.

---

"(iii) In the event the complainant accepts a lease at Gleanmeadow Apartments, any reasonable amount he may be obligated to pay in order to terminate or modify his present rental arrangements.

"3. Notify the Massachusetts Commission Against Discrimination at its offices at 41 Tremont Street, Boston 8, Massachusetts, in writing within thirty (30) days of the date of service of this order, as to steps respondents have taken to comply with each item in this Order.''