APPEALS COURT 
 
 KATHLEEN GEEZIL, personal representative,[1] vs. WHITE CLIFFS CONDOMINIUM FOUR ASSOCIATION & others[2]

 
 Docket:
 23-P-1103
 
 
 Dates:
 September 4, 2024 - November 13, 2024
 
 
 Present:
 Massing, Hand, & Smyth, JJ.
 
 
 County:
 Plymouth
 

 
 Keywords:
 Anti-Discrimination Law, Handicap, Housing. Real Property, Condominium. Massachusetts Commission Against Discrimination. Statute, Construction. Administrative Law, Agency's interpretation of statute. Practice, Civil, Summary judgment.
 
 

             Civil action commenced in the Superior Court Department on January 2, 2019. 
            The case was heard by Thomas F. McGuire, Jr., J., on motions for summary judgment. 
            Walter H. Jacobs for the plaintiff.
            Dillon M. Knight for the defendants.
            MASSING, J.  A provision of G. L. c. 151B, the Massachusetts antidiscrimination statute, makes the owners of certain multiunit housing accommodations, under certain circumstances, responsible for the expense of reasonable modifications necessary to afford "handicapped"3 occupants full enjoyment of the premises.  In this appeal, we must determine whether an association of condominium unit owners was responsible for the expense of accommodating an individual unit owner's handicap by modifying a patio exclusively dedicated to her unit but considered common area under the master deed.  Concluding that the association was not required to pay for the requested modifications, we affirm the entry of summary judgment for the association and its codefendants on the unit owner's complaint alleging unlawful discrimination and retaliation. 
            Background.  We set forth the material facts in the light most favorable to the plaintiff, the party against whom summary judgment entered.  Berry v. Commerce Ins. Co., 488 Mass. 633, 634 (2021).  
            The plaintiff's decedent, Mary T. McLellan, owned and resided in unit 214 of White Cliffs Condominium Four (Condominium Four) in Plymouth from 2000 until her death in 2021.  One of six developments that make up the larger White Cliffs Condominium complex, Condominium Four consists of twelve four-unit buildings and ten six-unit buildings neighboring one another - a total of 108 units.  McLellan's unit was in one of the four-unit buildings.  Condominium Four was developed and subsequently sold by Capeside Associates Limited Partnership (Capeside), which filed the master deed in August 1987.  Capeside sold unit 214 in 1988 and has had no association with it since.
            The individual units in Condominium Four are owned in fee simple.  Common areas are jointly owned by all unit owners and managed by the unit owners' organization, defendant White Cliffs Condominium Four Association (association).  Notably, common areas include all patios and decks, but individual units have easements for the exclusive use of any directly adjacent patio or deck.
            Unit 214 has a sunken living room and thus, an upper and lower level.  As originally constructed, sliding glass doors located on each level opened to a patio that was set down about six inches from the door frame.  The patio levels were connected by a flight of stairs.  At some time prior to 2017, McLellan began to suffer from several medical conditions that affected her mobility.  Among other things, she no longer was able to easily gain access to the patio or to move from one level of the patio to the other.  Because her patio was considered common area, McLellan made four requests for modifications to the association.  The association approved all but one of her requests.  Two of the three approved modifications were made.  The third -- a raised step at each of the doors providing access to the patio -- was delayed.
            During a June 2017 informational meeting with Condominium Four unit owners, the association unveiled its plan to replace the existing split-level patios with single-level patios set at the existing lower level.  In McLellan's unit, the new single level would remain accessible from her lower-level hinged doors; to reach the patio from the higher level's sliding doors, which would now be above the level of the patio, two steps would be installed.  Concerned that the new design would further hinder her ability to get to the patio from her upper-level kitchen, in October 2017 McLellan requested that she be permitted to retain her split-level patio with the existing modifications, plus the raised steps that had previously been approved.
            The association failed to provide McLellan a satisfactory response regarding the requested accommodations, and in January 2018, she filed a formal complaint with the United States Department of Housing and Urban Development (HUD).  During the HUD-facilitated conciliation process, the association agreed that McLellan could retain her split-level patio and that it would install the requested raised steps - at McLellan's expense.  McLellan refused, insisting that it was the association's obligation to "foot the bill."  In May 2018, HUD issued a finding of "no probable cause" to support McLellan's complaint for Federal disability discrimination.  Two days later, the association initiated the renovation of McLellan's patio -- about five months before the originally planned September 2018 start date.
            McLellan filed a charge with the Massachusetts Commission Against Discrimination (MCAD) on August 31, 2018, then filed a complaint in the Superior Court on January 2, 2019.  The complaint alleged that the association's refusal to cover the costs of reasonable modifications constituted unlawful discrimination in violation of G. L. c. 151B, § 4 (6), (7), and (7A).  She also alleged a claim of unlawful retaliation based on the renovation of her patio just two days following the HUD decision.  McLellan died in June 2021; her daughter, Kathleen Geezil, entered the case as the personal representative of McLellan's estate.  In a thoughtful memorandum of decision on the parties' cross motions for summary judgment, a Superior Court judge ordered entry of judgment in favor of the association and its codefendants, ruling that the association did not engage in an unlawful practice or retaliation within the meaning of G. L. c. 151B.
            Discussion.  1.  Standard of review.  We review a judge's grant of summary judgment de novo to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law."  Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).  A moving party may prevail by showing that the nonmoving party "has no reasonable expectation of proving an essential element" of its claim.  Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).  When, as in this case, the parties' dispute reflects a fundamental disagreement about the meaning of a statute, "unquestionably it is for the courts to interpret it."  DiGiacomo v. Metropolitan Prop. & Cas. Ins. Co., 66 Mass. App. Ct. 343, 346 (2006).
            2.  Statutory landscape.  Massachusetts law broadly prohibits discrimination in the selling, leasing, and management of most housing accommodations.  See G. L. c. 151B, § 4 (6), (7), (7A), (7B), (10), (11).4  The prohibition extends to a wide range of actors, listed in § 4 (6), (7), and (11), including "the owner, lessee, sublessee, licensed real estate broker, assignee or managing agent" of housing accommodations or land intended for housing; other persons "having the right of ownership or possession or right to rent or lease, or sell or negotiate for the sale of such accommodations"; their agents and employees; and "any organization of unit owners in a condominium or housing cooperative."
            The provision at the center of this appeal is included under G. L. c. 151B, § 4 (7A), in a list of practices amounting to "discrimination on the basis of handicap."  Specifically, refusing to allow handicapped persons to make reasonable modifications to their dwellings at their own expense is prohibited.  See G. L. c. 151B, § 4 (7A) (1).  For a narrow set of housing accommodations, however, the costs associated with such modifications must be borne by the property owner.  The relevant language is as follows:
"For purposes of subsections 6 and 7 discrimination on the basis of handicap shall include but not be limited to . . . a refusal to permit or to make, at the expense of the handicapped person, reasonable modification of existing premises occupied or to be occupied by such person if such modification is necessary to afford such person full enjoyment of such premises; provided, however, that, in the case of publicly assisted housing, multiple dwelling housing consisting of ten or more units, or contiguously located housing consisting of ten or more units, reasonable modification shall be at the expense of the owner or other person having the right of ownership" (emphases added).
G. L. c. 151B, § 4 (7A) (1).
            The plaintiff asserts that the association was responsible for the expense of McLellan's requested modifications under the "provided, however" clause (cost-shifting proviso) because it was the "owner or other person having the right of ownership" of the common areas, including her patio.  G. L. c. 151B, § 4 (7A) (1).  She further asserts that, with 108 units, Condominium Four qualifies as "contiguously located housing."  Id.  Prevailing on both assertions is essential to the plaintiff's ability to prove her claim of handicap discrimination. 
            3.  Is the association the "owner" of Condominium Four?  If the words of a statute are unambiguous, we assume that they are consistent with the intent of the Legislature and take them at face value, unless doing so would create an absurd result.  See Commonwealth v. Escobar, 490 Mass. 488, 493 (2022); Harvard 45 Assocs., LLC v. Allied Props. & Mtges., Inc., 80 Mass. App. Ct. 203, 207-208 (2011).  "Where a statute does not define a term, '[w]e derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions.'"  Escobar, supra at 493-494, quoting Commonwealth v. Morasse, 446 Mass. 113, 116 (2006).
            The association is not "the owner or other person having the right of ownership" of Condominium Four in the usual and accepted understanding of the terms "owner" and "ownership," which are not defined in c. 151B.  In the parties' own words, included in the stipulated facts for summary judgment, the association "is an unincorporated unit owner[s'] organization created by the Master Deed to manage and regulate [Condominium Four]" (emphasis added).  The "owners" of Condominium Four are the unit owners -- they own their units individually and the common areas jointly.  Again, in the parties' words, "the common areas are managed" -- not owned -- "by the [a]ssociation."
            If the Legislature had intended to impose the financial burden of making reasonable modifications on a condominium's organization of unit owners, "it could have said so simply and unambiguously" (citation omitted).  Thomas v. Department of State Police, 61 Mass. App. Ct. 747, 754 (2004).  Indeed, it is evident that the Legislature knew how to prohibit discrimination by "any organization of unit owners in a condominium" when it wanted to.  In listing the persons prohibited from discriminating on the basis of handicap, it included "any organization of unit owners in a condominium" in addition to, and separate from, "owner," any "other person having the right of ownership or possession," and others such as managing agents and real estate brokers.  G. L. c. 151B, § 4 (6), (7).  But in the cost-shifting proviso, it limited the financial responsibility for modifications to "the owner or other person having the right of ownership."  G. L. c. 151B, § 4 (7A) (1).  "[W]e do not read into the statute a provision which the Legislature did not see fit to put there," nor "add to a statute a word that the Legislature had the option to, but chose not to, include" (quotations and citations omitted).  General Elec. Co. v. Department of Envtl. Protection, 429 Mass. 798, 803 (1999), abrogated in part on other grounds by DaRosa v. New Bedford, 471 Mass. 446, 453 (2015).  We can readily infer that the Legislature did not mean to impose on condominium associations or, for that matter, real estate brokers or property management companies, the cost of modifying individual units to accommodate their occupants.
            The plaintiff relies heavily on a 2010 MCAD decision5 that appears to hold that a condominium trust qualifies as an "owner" within the meaning of the cost-shifting proviso.  We are mindful that MCAD has been entrusted with enforcing G. L. c. 151B and that its application of the statute is entitled to deference.  See Martinez v. Commissioner of Pub. Welfare, 397 Mass. 386, 392 (1986) ("[A]n agency 'has considerable leeway in interpreting a statute it is charged with enforcing'" [citation omitted]).  Principles of deference, however, "are not principles of abdication" (citation omitted).  Arrowood Indem. Co. v. Workers' Compensation Trust Fund, 104 Mass. App. Ct. 419, 421 (2024).  "If an agency interpretation were to collide with the plain meaning of a statute, the agency view would have to give way."  Anheuser-Busch, Inc. v. Alcoholic Beverages Control Comm'n, 75 Mass. App. Ct. 203, 209 (2009).  We conclude that is the case here.
            4.  Does Condominium Four qualify as "contiguously located housing"?  In addition to concluding that condominium associations are not "owners" subject to the cost-shifting proviso, we further conclude that McLellan's unit does not qualify as "contiguously located housing consisting of ten or more units" as used therein.  G. L. c. 151B, § 4 (7A) (1).  The term "contiguously located housing" is specifically defined in c. 151B as follows:
"housing which is offered for sale, lease or rental by a person who owns or at any time has owned, or who otherwise controls or at any time has controlled, the sale of ten or more housing accommodations located on land that is contiguous (exclusive of public streets), and which housing is located on such land."
G. L. c. 151B, § 1 (12).6
            Under this definition, contiguously located housing must meet three criteria.  First, it must be "housing which is offered for sale, lease, or rental."  G. L. c. 151B, § 1 (12).  Second, the person offering it must be "a person who owns or at any time has owned, or who otherwise controls or at any time has controlled, the sale of ten or more housing accommodations."  Id.  Third, the ten or more housing accommodations that the offering person owns, owned, controls, or controlled, as well as the housing being offered, must be "located on land that is contiguous (exclusive of public streets)."  Id.7
            The parties stipulated that McLellan's unit was not being offered for sale, lease, or rental at any time relevant to this case.  They further stipulated that the association never sold, leased, rented out, owned, or controlled the sale of ten or more units.  Although these stipulations suggest that the first two criteria of the definition are unmet, McLellan argues that this case nonetheless involves "contiguously located housing" because at some point in time the original developer, Capeside, met all three criteria.  Like the motion judge, we are not persuaded.
            McLellan's claim founders on the first criterion because she owned her unit in fee simple and her patio jointly with the other unit owners at the time she requested the modifications.  Therefore, her premises did not qualify as "housing which is offered for sale, lease or rental" (emphasis added).  G. L. c. 151B, § 1 (12).  "In construing this clause, we turn to familiar rules, including the standard rules of grammar."  DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 803 (2013).  The Legislature's use of the present tense verb "is offered" in the first clause of the definition is significant.  See Commonwealth v. Cory, 454 Mass. 559, 563 (2009) (finding dispositive Legislature's use of present tense verb, "is placed").  See also United States v. Wilson, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes").
            "The use of the present tense in a statute strongly suggests it does not extend to past actions."  Sherley v. Sebelius, 644 F.3d 388, 394 (D.C. Cir. 2011).  For example, in Chartier's Case, 19 Mass. App. Ct. 7, 7 (1984), we construed a provision of the workers' compensation statute that provided a more generous calculation of benefits "[i]n case the injured employee is employed in the concurrent service of more than one insured employer or self-insurer" (emphasis added), quoting G. L. c. 152, § 1 (1), as appearing in St. 1943, c. 529, § 1.  The employee had held two jobs simultaneously as recently as three months before his injury, but at the time of his injury had only a single employer.  Chartier's Case, supra at 8.  Reasoning that the "[u]se of the present tense 'is' in the statute suggests quite strongly that the Legislature intended that the concurrent employment exist at the time the injury was sustained," id. at 9-10, we held that the employee's status at the time of the injury, not his past status, governed.  Cf. Koehn v. Delta Outsource Group, Inc., 939 F.3d 863, 865 (7th Cir. 2019) ("After all, the simple present-tense verb 'is' also implies 'current,' doesn't it?"); Humane Soc'y of the U.S. v. Zinke, 865 F.3d 585, 604 (D.C. Cir. 2017) (term "is in danger of extinction" in Endangered Species Act's definition of "endangered" "seems most naturally to require that the species currently be endangered").
            If the Legislature had intended for the definition of "contiguously located housing" to apply to housing that was not currently being offered for sale, lease, or rental, but had been offered for sale, lease, or rental at any time in the past, it knew exactly how to do so.  It is telling that in the very next clause of the definition, setting forth the second criterion, the Legislature used both the present tense and a form of the past tense to describe "a person who owns or at any time has owned, or who otherwise controls or at any time has controlled, the sale of ten or more housing accommodations" (emphases added).  G. L. c. 151B, § 1 (12).  The second criterion thus applies not only to persons who, at present, own or control ten or more units and are offering a unit for sale, lease, or rental, but also to persons who owned or controlled as many as ten units at one time and are currently offering a unit for sale, lease, or rental.  The Legislature could have used similar language in the first criterion to refer to "housing which is or at any time was offered for sale, lease, or rental," but chose not to.  We will not change the meaning of a statute by inserting language that the Legislature omitted.  See General Elec. Co., 429 Mass. at 803.
            Limiting the first criterion of the definition to housing that is currently being offered for sale, lease, or rental does not create an absurd result.  To the contrary, it is consistent with "the statutory scheme as a whole."  Retirement Bd. of Stoneham v. Contributory Retirement Appeal Bd., 476 Mass. 130, 135 (2016).  See Campbell v. Schwartz, 47 Mass. App. Ct. 360, 364 (1999).
            In an early challenge to the constitutionality of G. L. c. 151B, § 4 (6), brought by the owner and rental agent of a newly built, 120-unit apartment building, the Supreme Judicial Court rejected claims that the prohibition of race discrimination in renting and leasing apartments violated the plaintiffs' property rights, liberty to contract, and freedom of association.  See Massachusetts Comm'n Against Discrimination v. Colangelo, 344 Mass. 387, 389, 391-392 (1962).  The court explained that the statute's primary aim was "preventing discrimination in the business of housing" (emphasis added).  Id. at 398.  The court emphasized that in applying the statute's antidiscrimination provisions to large, privately-owned properties, the Legislature was targeting commercial activity:  "In its application to privately financed multiple dwelling and contiguously located housing accommodations, the statute seeks to reach leasing and selling when conducted as a business."  Id.  The MCAD's regulations implementing G. L. c. 151B, § 4, similarly emphasize the business of selling, renting, or leasing housing.  See 804 Code Mass. Regs. § 2.01(1) (1993) ("Massachusetts Fair Housing statute . . . prohibits discrimination . . . in the selling, renting or leasing of housing accommodations, commercial space, or land intended for use as such").
            Conclusion.  Because the plaintiff had no reasonable expectation of proving that the association qualifies as the "owner" of McLellan's unit within the meaning of the cost-shifting proviso, or that McLellan's unit "is offered for sale, lease or rental" as required under the definition of "contiguously located housing," G. L. c. 151B, § 1 (12), the plaintiff had no reasonable expectation of proving McLellan's claim of handicap discrimination.8  Summary judgment for the defendants is affirmed.
So ordered.
 
footnotes

 
            [1] Of the estate of Mary T. McLellan.
            [2] TDG Management, Inc.; Matthew Page; and Associa, Inc.
            [3] Although we recognize that the term handicapped may hold unwarranted negative connotations, we employ the terminology used in the statute.  See G. L. c. 151B, §§ 1 (17), 4 (7A) (1).
            [4] The antidiscrimination provisions of G. L. c. 151B, § 4 (7), do not apply to "the leasing of a single apartment or flat in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence."  The provisions of G. L. c. 151B, § 4 (11), which prohibit housing discrimination against families with children, do not apply to owner-occupied two-family dwellings, dwellings with up to three units occupied by elderly or infirm persons, or sublets of one year or less.
            [5] Kacavich v. Halcyon Hill Condominium Trust, 32 Mass. Discrimination L. Rep. 148 (2010).
            [6] A second definition of "contiguously located housing," not relevant here, concerns housing tracts of ten or more lots submitted to a planning board under the subdivision control law.
            [7] We assume without deciding that as one of 108 units in twenty-two adjacent buildings, McLellan's unit was one of ten or more "located on land that is contiguous," notwithstanding the fact that her building contained only four units.  But see 804 Code Mass. Regs. § 2.03(3) (1993) ("Under state law, if the dwelling is in a building with ten or more units . . . the owner must pay for the reasonable modifications" [emphasis added]).
            [8] Although the plaintiff's brief states in conclusory terms that the defendants retaliated against McLellan "for asserting her rights under the law," she does not make any legal argument that McLellan had a viable claim of retaliation.  As presented, the claim "is insufficient to rise to the level of appellate argument, and thus is deemed waived."  Commonwealth v. Kalila, 493 Mass. 636, 641 n.6 (2024), citing Mass. R. A. P. 16 (a) (9), as appearing in 481 Mass. 1628 (2019).