## Stanton Land Co. v. City of Pittsburgh

*Gilbert J. Helwig, Edward Hoopes, 4th, Reed, Smith, Shaw & McClay,* for plaintiffs.

*David W. Craig*, City Solicitor, *Marion K. Finkelhor*, Assistant City Solicitor, for defendants.

*John B. Nicklas, Jr.* and *Byrd R. Brown*, for intervenors.

*Hon. Walter E. Alessandroni*, Attorney General of Pennsylvania, *Arthur C. Thomas*, Deputy Attorney General, *Nathan Agran*, for Pennsylvania Human Relations Commission.

*Hillard Kreimer, William A. Weiler, Gerald Kaufman* and *Walter E. Gay*, for Allegheny County Council on Civil Rights and Pennsylvania Equal Rights Council.

WEIR, J., November 30, 1963.—

## The Parties and Pleadings

This case which is one of first impression in Pennsylvania involves both a bill in equity and a counterclaim in equity. Plaintiffs Stanton Land Company and Francis X. Totten instituted this litigation in an effort to nullify the effect of an order of January 24, 1963, which was issued against them by the Commission on Human Relations of the City of Pittsburgh which directs them to sell a lot to Doctor Oswald J. Nickens, who is a Negro. Defendants named in the complaint are the City, the Commission and its executive director Louis Mason, Jr., and City Solicitor David W. Craig. The counterclaim seeks to have this same directive of the Commission enforced by this court and presumably would have been filed as an original action by the City through Mr. Craig if plaintiffs had not already taken the initiative. In any event, the municipal ordinance under which the Commission functions requires the city solicitor to move to enforce the orders of the Commission by appropriate action which would necessarily be in this court, so that ordinarily we would expect the positions of the parties as plaintiffs and defendants to be reversed, but this is only a procedural peculiarity. A

formal petition for intervention by Doctor Nickens brought him onto the record as a party defendant and upon oral motion the Greater Pittsburgh Board of Realtors was allowed to participate in behalf of plaintiffs, and counsel for both of these parties assumed active roles in the trial. Also, permission was granted Pennsylvania Human Relations Commission and Pennsylvania Equal Rights Council and Allegheny County Council on Civil Rights to file briefs. All of the foregoing involvements were without objection.

## The Background of the Litigation

In 1958, the City of Pittsburgh enacted ordinance no. 523, designated as a Fair Housing Ordinance. Its avowed purpose, stated here in the simplest terms, is to implement with respect to private housing accommodations the concepts expressed in the Fourteenth Amendment of the United States Constitution, and article I, sec. 1 of the Pennsylvania Constitution; namely, to provide that people may choose their place of residence without restriction resulting from race, religion, or national origin, and to promote the individual and public welfare by the eventual elimination of ghettos with their depressing effect upon the human spirit and their costly impact upon government in the form of reduced revenues and increased expenditures resulting from problems born of life in the slums. In order to accomplish its objectives, the ordinance prohibits individuals and corporations from refusing to sell residential property on account of the race or religion of the prospective purchaser, with certain exceptions which are immaterial at this time. The Commission on Human Relations is the agency of the City which is responsible for the administration of the ordinance by education, persuasion, and if necessary, by legal action. Under an ordinance, of course, the only penal sanction which can be invoked is a modest fine, after a summary conviction, with imprisonment possible only upon non-

payment. The effective ultimate instrumentality of enforcement is a bill in equity for an injunction, as is sought here by way of the counter-claim.

Since 1957, Stanton Land Company, a corporation of which Francis X. Totten is the president and his wife the sole stockholder, has been developing for residences a tract of 40 acres in the tenth ward which is called Stanton Heights Manor Plan and which has been subdivided into numbered parts as the total project progresses. The lot involved in this case is number 271 in plan 2-A. Prior to June of 1962, Stanton Homes, Inc., a companion company, would erect custom built homes on the lots sold by Stanton Land Company, but after this date the sale and erection of the houses was turned over to a financially unrelated organization named Ryan Homes, Inc., which operates on a large scale in the field of housing which ranges from above average to luxury types. Ryan publicly advertised homes in Stanton Heights and Doctor Nickens decided to purchase one for a total cost in land and building of approximately $35,000 to be erected on lot 271, which is of suitable shape for the house model which was selected. Ryan's employes were proceeding to consummate the deal, although slowly and with apparent trepidation, but they withdrew when they ascertained definitely that Stanton Company, acting through Mr. Totten, would not convey the lot for this purpose. Ultimately, Ryan, in view of its own awkward position in these negotiations, agreed to build the house if the lot could be obtained, but Mr. Totten has persisted in his refusal to convey the lot. There the matter now stands, with the City of Pittsburgh urging that this court should require the sale of the lot to Doctor Nickens upon payment for it and plaintiffs taking the position that they should not be required to sell because they are not in violation of the requirements of the ordinance in the first place, and that the latter is completely invalid

in any event for reasons including constitutional considerations, or that its provisions are being applied in an unconstitutional manner in this instance.

### The Violation of the Ordinance

A court does not pass upon the constitutionality of legislation unless the issue before it cannot be resolved otherwise: Robinson Township School District v. Houghton, 387 Pa. 236; Youngstown Sheet & Tube Company v. Sawyer, 343 U.S. 579; and such constitutional evaluation is unnecessary here if plaintiffs have not in fact violated any clear provision of ordinance 523. The scope of the ordinance encompasses unimproved lots in its definition of housing accommodations or housing units and covers land which contains five or more lots in the control of a single owner. It is an unlawful practice "for any owner to refuse to sell . . . any housing unit . . . to any person . . . because of race, color, religion, ancestry or national origin." One of plaintiffs' contentions is that they are not refusing to sell to Doctor Nickens on account of his race, in the sense that this is not the sole reason for the refusal. It is Mr. Totten's position that Doctor Nickens would not fit into the neighborhood because he is aggressive as well as colored, and that he is motivated more by the aspiration to promote the cause of equality of races than by the simple desire to own a particular house in a particular locality. The reason for withholding the conveyance is summarized at one point as: "Quite honestly it is because he is a Negro and . . . as a Negro, he is a Zealot," and it is asserted that plaintiffs would not necessarily exclude any Negro in any circumstances.

Thus, there is a disclaimer of prohibited conduct because the refusal to sell is said to be based upon an acquired personality characteristic of the applicant which is wilful and not congenital; or at least that this acquired characteristic is a real and inseparable partial

cause of the refusal. Of course, the ordinance does not require that one sell to another because of race, but only the converse of this, and the actual reason for not selling is therefore crucial. It is an unusual feature of laws against discrimination that they require us to deal with the subjective mental state of the recalcitrant. Certainly one should know one's own thinking best, but it is a commonly observed phenomenon that even honest people may be incapable of accurately describing their own purposes where their self interest is concerned. In any event, there could be no enforcement of these laws if we simply accepted the word of the individual involved, regardless of his apparent or known integrity. The subtle influences of racial prejudice affect many otherwise intelligent and religious people subconsciously. Therefore, we must look beyond the avowed motivation of the person whose conduct is being scrutinized and having done so in this situation we find it hard to accept.

In the first place it is not compatible with plaintiffs' forcefully emphasized contention that integration of residential areas of this sort eliminates the white market and would in this instance bring financial ruin to the development, because white persons represent the only potential market for housing in this rather high price bracket in this area. Without minimizing other arguments, it may be said that this is a fundamental substantive point in plaintiffs' entire case and that it is advanced without regard to the individual characteristics of the Negro family which initiates the integration. The prediction of bankruptcy in the event of the presence of any Negro family in Stanton Heights Manor Plan is somewhat at variance with the pronouncement that the entry of Negroes as such would not be resisted.

What is perhaps a more important consideration is that we cannot detect any reasonable basis for regard-

ing Doctor Nickens as aggressive in the context of his activity herein, or as a zealot; at least there is nothing of this nature to be found in the testimony which was elicited in depth during many days in the courtroom, and in this connection it may be appropriate to mention that this trial was conducted by counsel of conspicuous ability on both sides of the table, so that there is no reason to suppose that we did not get the complete picture. No indication of aggressiveness appeared in Doctor Nickens' responses as a witness during hours of skillful cross-examination. This is a fact which may not be decisive in itself since he is a highly educated man whose behavior was on public exhibition, although learning does not usually prevent the display of strong personality characteristics in these circumstances.

An even greater difficulty with the concept of aggressiveness as applied here by Mr. Totten is that it is predicated solely on the fact that Doctor Nickens was accompanied by his lawyer when he first came to Mr. Totten's office to request the sale of the lot. Immediately there is the question of whether we can say that a layman may be deemed aggressive because he takes a lawyer to a conference which is essentially legal. This could just as well be interpreted as a manifestation of timidity or at least as the display of an excess of caution; but we agree that it is not the usual thing to do when simply meeting to discuss the sale of a lot. However, this was not the usual situation which one encounters in seeking a lot. Here we have Ryan eagerly trying to sell houses and a customer with money eagerly trying to acquire one, but nothing happens after a deposit is accepted. Ultimately the seller must inform the buyer that the deal is off because the lot cannot be obtained, even though normally this detail has been taken for granted as it necessarily would have to be in a sales campaign directed toward the general public. In this anguished dilemma Ryan is forced to reveal that

Mr. Totten has blocked the proceedings on account of Doctor Nickens' color and for no other reason. Such then is the background of the lawyer's entry upon the scene, and it goes without saying that his presence now is understandable, and does not impute aggressiveness or zealotry.

It may be said that our discussion of aggressiveness or zealotry could well have been shortened by the mere observation that plaintiffs reached a settled determination to not sell to Doctor Nickens before Mr. Totten ever saw him or spoke to him, so that the presence of a lawyer or any objective thing or subjective impression related to the conference could not possibly have had any effect upon plaintiff's decision. Actually this seems to be the simple truth of the matter, but since this item is one of the two principal points involving factual conflict in the case, we have elected to analyze it in somewhat greater depth. Having done so, we are constrained to conclude that color alone has caused this controversy.

It might also be said that it is unnecessary to decide whether Mr. Totten's professed belief that Doctor Nickens is a zealot is tenable, since the former does not maintain that this characteristic alone would bar an applicant for a lot. Stanton Heights Manor Plan is not unavailable to persons who ardently embrace various political, moral or social theories, and it is not pretended to be any such dull place. So if we adopt the interpretation of the evidence which is most favorable to plaintiffs, we have a prohibition of a zealot who is a Negro, and the fact of being a Negro is an essential ingredient in the personality of the rejected individual and a substantial factor in causing the rejection. Thus, the terms of the ordinance are violated in this instance on plaintiff's own testimony. It would be otherwise if a developer refused to sell on account of zealotry alone since this would be the exercise of a permissible whim,

even if it resulted from an esoteric idiosyncrasy of the land owner. However, the City has decided that racial prejudice is so widespread and so dangerous to the general welfare that it cannot be indulged whether whimsical or otherwise.

Before departing from this subject of aggressiveness it may not be amiss to concede the possibility that Doctor Nickens was, or became, rather touchy and ready to take offense during this affair, as plaintiffs insist. The suggestion of Mr. Totten that he would locate a home site for him elsewhere could in itself be infuriating to a professional person, although we know it was not intended to be. Apart from this, we scarcely can expect that one who grows up as a Negro in our society should not be somewhat susceptible to affront, even though many may not be. But in any event if we were called upon to establish reasonable standards of restraint in reaction to various measures of contumely, we would not be persuaded to declare that normal human patience of either Negro or white must equal that of a Gandhi.

### The Validity Generally of Fair Housing Legislation

The forensic clash which occupies the stage more than any other struggle of conflicting ideas in this case relates to the implacably opposed concepts of plaintiffs and defendants on the issue of the importance of freedom of choice with respect to the disposition of private property, vis-a-vis the necessity of removing the aged restrictions on choice of residence which have fettered all but Caucasians, and even some of these at times. Most of the expert testimony and its attendant exhibits revolves around this focal point of dispute which is not irrelevant to the specific ordinance and the manner of its application, but which is more directly relevant to the basic constitutional problem divorced from the challenge to the right of the city to act in this area of government and the way it has acted.

And in approaching this basic problem it is interesting to note that the adversaries in this litigation both invoke the same constitutional provisions in support of their positions and particularly the clause of the Fourteenth Amendment of the United States Constitution which reads: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." Defendants and their intervening allies say that equal protection of law is a mockery if citizens of the wrong color are effectively denied the privilege to live where their resources permit, and that a State certainly may within the spirit of the law implement the right to equal protection positively although it is expressed negatively in the amendment. See Strauder v. West Virginia, 100 U. S. 303. Plaintiffs and the board of realtors draw upon a wealth of decisions which have upheld individual rights in property under the "due process" clause, there having been more activity in the courts in this respect in the last century than in connection with the suppression of Negroes, which caused the adoption of the amendment in the first place.

There is no doubt that the possession and control of private property is a fundamental right in a free and open society. At certain times in our history, such as in the late thirties, the expression "human rights versus property rights" became an election slogan, but in the longer stream of our political life property rights have held their place among the important human rights which we revere. The sanctity of private property is more venerated in periods of prosperity when the majority have more possessions to protect, and presently its importance is underlined by our rivalry with communism and our hostility to that system which abjures private ownership entirely. None the less our commit-

ment to liberty is even deeper than our commitment to property as may be observed in various pronouncements of national policy beginning with the Declaration of Independence. It is true that the glorious preamble thereof which says ". . . that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are Life, Liberty and the pursuit of Happiness . . ." was sullied by the practice of slavery at the very moment of its publication, and that it required our bloodiest war to begin the erasure of this hypocrisy. But hypocrisy was not invented in the United States nor has it been confined to any one land or people, and the moral redemption of a nation, as with an individual, will be determined more by its eventual choice of direction than by its aberrations along the way. Now, albeit almost two centuries after the Declaration of Independence, and a century after the Fourteenth Amendment, the responsible political force of our national and state government is laboring to make these inspiring words mean what they say and is joined in this effort by our major religious groups and great numbers of private citizens who are striving to subdue their own prejudices through the force of their own reason. This movement is as practical as it is idealistic and one of its offsprings is Fair Housing Legislation.

So we have the equality of persons and the rights in property running parallel with each other, and if at times they seem to conflict, they must nevertheless exist together and yield to each other in the interplay of privileges and duties which is necessary for the general welfare: Village of Euclid v. Ambler Realty Company, 272 U. S. 365 (1926) ; Best v. Zoning Board of Adjustment, 393 Pa. 106 (1958). The determination of what is necessary for the latter is clearly a legislative power exercised by the direct representatives of the people and not to be questioned by a court unless manifestly

beyond constitutional limits: Ferguson v. Skrupa, 372 U. S. 726 (1963).

Applying the frequently repeated principle of Ferguson to the specific subject of Fair Housing Legislation, the Supreme Court of New Jersey in Jones v. The Haridor Realty Corporation, 37 N. J. 384, 181 A. 2d 481 (1962) says: (37 N. J. 392)

"Discrimination against Negroes in the sale and rental of housing accommodations results in inadequate housing for them and in segregation in housing. They are thus compelled in large numbers to live in circumscribed areas under substandard, unhealthy, unsanitary and crowded living conditions. These conditions in turn produce disease, increased mortality, unstable family life, moral laxity, crime, delinquency, risk of fire, loss of tax revenue, and intergroup tensions . . . All of these things imperil the tranquillity of a community. In addition, substandard and segregated housing seriously complicates the problem of public school integration. Manifestly, in their totality these conditions reveal an evil which it is within the competence of the lawmakers to correct."

The law is settled to the same end by final appeal in California, Burks v. Poppy Construction Company, 57 Cal. 2d 463, 370 P. 2d 313 (1962); in Colorado, Colorado Anti-Discrimination Commission v. Case, 330 P. 2d 34 (1963); and in Massachusetts, Massachusetts Commission Against Discrimination v. Colangelo, 344 Mass. 387, 182 N. E. 2d 595 (1962), and by lower courts elsewhere. A divided Supreme Court of the State of Washington decided otherwise in O'Meara v. Washington State Board Against Discrimination, 58 Wash. 2d 793, 365 P. 2d 1 (1961). The majority view in the latter case, which we reject, is based to a great extent upon the fact that the legislation in Washington applied only to publicly assisted housing. This reasoning does not—as we see it—take into account the emphatic statements

of the Supreme Court of the United States that a state has broad latitude in approaching the solution of social and governmental problems gradually and selectively: Williamson v. Lee Optical of Oklahoma, Inc., 348 U. S. 483 (1955).

We have no doubt that the tradition and law of the very Commonwealth which sheltered the Continental Congress are consonant with the pronouncements of the majority on this vital issue, and that Fair Housing Legislation is constitutional in Pennsylvania.

### *The Validity of the Ordinance As Such*

If governmental intervention in private affairs is permissible to the extent of interdicting racial choice in the sale of real estate, we are met by the more difficult problem of whether a city in this Commonwealth, and particularly the City of Pittsburgh has the right to occupy this area of governmental activity, and also whether it has done so properly in the terms of ordinance 523.

The legislative grant of power which is involved here is not recent, being contained in the Act of March 7, 1901, P. L. 20, art. XIX, sec. 3, cl. XLIII, 53 PS §23158, permitting the city council:

"To make all such ordinances, by-laws, rules and regulations, not inconsistent with the Constitution and laws of this Commonwealth, as may be expedient or necessary, in addition to the special powers in this section granted, for the proper management, care and control of the city and its finances, and the maintenance of the peace, good government and welfare of the city, and its trade, commerce and manufactures, and the same to alter, modify, and repeal at pleasure; . . ."

On its face this language is about as broad as the human mind could contrive to make it, and is at least as broad as the New York statute under which New

York City enacted a similar ordinance which has been upheld: Martin v. City of New York, 201 N. Y. S. 2d 111 (1960). It appears to be true that the City of Pittsburgh has not attempted to use this clause of its charter act very boldly over the years and when it did so in 1920 by licensing securities salesmen it was rebuffed by this court in Hawkins v. City of Pittsburgh, 68 Pitts. L. J. 561, which held that the clause only intends to cover subjects ordinarily regarded as municipal. However, in 1920 even the stock exchanges were autonomous, whereas we now accept many regulations of business activity which would have been denounced as intolerable meddling in 1920. In short, our views have changed on the role of government in our lives. In the current of this change, the city found it expedient to move toward integration in housing without waiting for the state wide legislation which followed later: Act of February 28, 1961, P. L. 47. Did it have the right to do so under the Act of 1901?

On the one hand we have this very expansive delegation of power and no other statute limiting its use for the present purpose. For what it is worth as a subsequent expression of the public policy of the Commonwealth we also have the constitutional amendment of November 7, 1922, article XV, section 1, which sanctions such delegation of power. On the other hand it is certain as can be that the legislature in 1901 did not intend that a city would ever require the transfer of real property contrary to the personal desire of the owner except by condemnation. We can safely assume also that no substantial number of voters contemplated any such thing in November, 1922, when they approved the amendment. This being true, as we believe it to be, a natural reaction is that the city could not possess and exercise a power which the grantors did not intend to bestow, or that the city could not go beyond the conscious intention of the Act of 1901 and

seize upon a fortuitous choice of words to achieve an unintended result. Such reasoning is plausible and might well bespeak acceptance were it not for the principle of construction which was pronounced by the Supreme Court of the United States in the most famous of all integration cases, Brown v. Board of Education of Topeka, 347 U. S. 483 (1954). We hasten to say that we do not view Brown as apposite to this case, even though both concern integration. The main points involved in each are of course quite different. It so happens, however, that an incidental problem which was involved in Brown is quite analogous to the sticky legal difficulty which we have noted in construing the Act of 1901, and is the very problem which bothered the Supreme Court to the extent that it called for reargument on the applicability of the "equal protection" clause to public education. After this reargument which was largely devoted to the circumstances surrounding the adoption of the Fourteenth Amendment in 1868, the court speaking through the Chief Justice announced that it could find no substantial evidence that public education was a matter of concern in the minds of those in Congress or the State legislatures who voted on the amendment. Public education then was of so little importance in this country that spokesmen for and against the amendment did not think about it or talk about it and thus did not consciously intend anything about it in the "equal protection" clause. But the court said, pages 492-3:

"In approaching this problem we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when Plessy v. Ferguson was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws."

We believe that the foregoing rationale must be the only true way of relating legal expressions of the past to problems of the present. It is a rule of construction which is pragmatic. Segregation in housing, which was not envisioned as a proper concern of government in 1901 is now widely regarded as such. It need not be so regarded universally or even by a majority, any more than with integration of schools. A national poll need not be taken on either. Ours is a republican form of government. It is only necessary that segregated housing be a serious social problem to invest the city council with the right to deal with it in its own wisdom under the "welfare" clause of the Act of 1901. Thus we are convinced that the city did not encroach beyond the boundaries of its delegated power and its inherent power in enacting ordinance 523, and this conclusion has been reached without any need for reliance upon the dubious theory of validity by legislative ratification as possibly expressed in the Act of February 28, 1961, P. L. 47, supra.

### The Role of the Commission on Human Relations and the Effect of its Orders

Another objection to ordinance 523 is that it invests the commission with a broad, undefined and non-delegable power to enforce the ordinance by issuing "such orders as the facts warrant".

This argument is not too impressive. It seems to assume a finality to the orders of the commission which they do not have. They are similar in effect to various directives which are commonplace matters in our lives at all levels of government. They are not self-enacting in their sanctions. Even the powerful and time honored commissions which are legislative arms of the Federal and State governments cannot imprison people or seize the assets of individuals or corporations for failure to

heed their commands. The final process of enforcement of all laws takes place in the judicial branch of government, although fortunately only a minute minority of the conflicts between personal desire and public restraint ever reach this stage.

The ordinance does not and needless to say could not empower the commission to call directly upon the sheriff and the prothonotary, nor could it require this court to take jurisdiction by direct appeal and fix the conditions of appeal. Only the legislature could do the latter within reasonable limits and even the legislature itself could not do the former. This is why the record is certified "to the City Solicitor for appropriate action to secure enforcement of the Commission's order." In general the claims of government, as well as those of individuals against others, or vice versa, tend to give rise to justiciable causes which the courts must at least heed pursuant to Pennsylvania Constitution, article I, sec. 2, and consider further as the circumstances warrant. The courts are open to citizens who complain of wrongs inflicted upon them and no less so to municipalities. To say more would be to belabor the obvious since plaintiffs started this very litigation in reliance upon this simple fundamental right.

The delegation of legislative responsibility to administrative bodies is one of the numerous phases of law in which there are irreconcilable decisions from which to argue in any direction. If one advocate cites a case, his opponent can cite two others and so on. In fact, this is a condition which is fairly general in the law, and has grown increasingly so, perhaps inevitably resulting from the burgeoning complexity of social problems and the adjustments they require. However, we believe it fair to say that the legal philosophy which deplores delegation relates mostly to situations in which the administrative body is given the last word

for practical purposes, as, for example, where the order can be contested only by showing a gross abuse of discretion.

Here we have no semblance of such an attribute in the subject order as is obvious from the fact that the chancellor heard the case de novo even though the counterclaim seeks only a civil judgment. It may be true in a narrow technical sense that the ordinance enjoys a presumption of validity, as contended by defendants, but if so it is of little consequence because we have not based our conclusions respecting constitutionality on such a tenuous ground as the burden of proof. As to all material factual matters which are involved here we agree with plaintiffs' position that the burden of proof is on defendants. If it were otherwise we would have to say that a city council could create presumptions or alter rules of evidence. No such *ultra vires* purpose or pretension is noted in ordinance 523.

### *The Legality of the Order of the Commission*

We have alluded heretofore to the protest of plaintiffs that they will be destroyed financially if compelled to admit a Negro family into Stanton Manor Plan. This allegation, vehemently denied by defendants, is a part of the argument against the constitutionality of Fair Housing legislation generally and ordinance 523, particularly; but it is even more vigorously advanced against the specific order of the commission. Actually a preponderant part of the rather lengthy trial was devoted to this phase of the case, and to a lesser extent to the quality of the present habitation of the Nickens family, and other existing choices of location available to them apart from Stanton Heights. Plaintiffs' exhaustive written presentation also deals articulately with these items. In essence, it is the position of Stanton that the order of January 24, 1963, is so foreign to the purposes of ordinance 523, and so gro-

tesquely inappropriate as a palliative of the social evils of segregated housing that it is frivolous, oppressive, and unconstitutional, even postulating the validity of the ordinance. Or, to put it another way, it is viewed as a grim exercise of power with political overtones whose consequence apart from its public impact is to destroy a large investment in a worthy enterprise and satisfy thereby the caprice of one who has no need of help and whose personal ambition is not a proper concern of this law, and was not intended to be. This rationale is a complex of at least three separate and somewhat intriguing concepts.

One facet of this argument, namely, the suggestion of political expediency depends upon the assumption that the order involved here is popular to the extent at least that it would be applauded by most of the local population. Yet if there is one belief in which all counsel concurred during the trial, and which they now reiterate in their briefs, it is the existence of widespread racial prejudice among whites who are in such an overwhelming majority.

This is the platform from which both sides prophesy disaster immediate or ultimate unless their respective views prevail. We are convinced that both sides believe these prophesies because they are so sure of the existence of this prejudice. Let us assume then that both are correct in their convictions that this prejudice is a powerful force in our society. If this be true, how can the order of the commission be popular and how can an order whose unpopularity can be so easily foreseen be the product of political expediency? On the other hand let us assume only for the sake of argument that the parties are wrong in this conviction and that most of the white population favors integration to the extent that they will support officials who support it. Then if this latter hypothesis should be the correct one, it would be hard to see how the presence of a Negro physician

would depreciate property values of an entire neighborhood or trigger such a result. Granting the subtle distinctions which can be made between one's ideals and one's conduct, we still do not see how you can have it both ways. Can there exist within the narrow confines of Pittsburgh at one and the same time a strong mass emotion in favor of integration and an almost universal abhorrence of contact with educated people of a different color? We cannot regard this as likely. Or to put it another way, we do not believe that there is a large bloc of citizens who are attracted to the prospect of racial equality and simultaneously repelled by the slightest interracial contact, even granting the dramatic difference between our mores as proclaimed and our folkways as practiced. However, this is only a diversion in dialectic, because we definitely agree with counsel that prejudice on a broad scale is the fact of life, and accordingly we cannot seriously regard the Commission on Human Relations as the probable winner of a popularity contest. And actually we wonder whether the allusion to political expediency could really be intended seriously. It does not seem to fit into the general picture and may have crept into the discussion unintentionally. After all, there is a tendency, habitual and subconscious, to suspect the motivation of all officials and to assume that they invariably follow the example of the fabled character of the French Revolution who said, "I hear the noise of the mob in the street. I must go out and discover their plans because I am their leader."

Unfortunately the reality of this present moment in history seems to be such that if our eighteenth century Frenchman were alive and in politics he would be indulging in some very facile mental acrobatics. He would be giving lip service to integration while deploring the impossibility of achieving it within, shall we say, the lives of the audience. This is because most people are less than eager for equality of the races

when it touches them immediately. It is one thing to deplore what happens in South Africa or in Alabama and quite another to undergo the personal adjustments required by the Constitution and the precepts of Judao-Christian ethics. The best minds in the churches, the schools, the public press, and elsewhere, including both political parties, recognize the overwhelming necessity of achieving better racial relations and many are hard at work on this most important project. Nevetheless, their superb efforts have not yet made true equality popular. It may be less unpopular than formerly, but here again there is the distinct possibility that we are now witnessing a certain hardening of attitude on the part of the whites. But the efforts cannot stop and of course will not stop. However, they would never be necessary in the first place if racial equality were popular. And surely, above all, this unselfish activity does not come under the heading of expediency.

The second and probably a more important aspect of the argument is that the ordinance should not be used in favor of high income persons who already are adequated housed and who also have other desirable locations available to them on a voluntary basis. As applied to Doctor Nickens it is said that he lives in a well built duplex in a good integrated neighborhood, has no personal problem which requires governmental intervention, and that his moving would accomplish nothing in the way of alleviation of substandard living conditions or any other social ill.

This is an unusual and resourceful line of reasoning. We usually hear it the other way around; that there should not be one law for the rich and another for the poor, and there are complaints that the law does not operate equally in this respect. For example, the opponents of capital punishment point out that wealthy people rarely go to the electric chair. This may be misleading because wealthy people are not often motivated

to do the few things which lead to execution such as shooting in the commission of armed robbery, but we mention this as one of the frequent complaints of disparity in the law's application. On the other side of the coin, it is stated critically that corporations can seldom get an even break from a jury when opposed to lowly individuals. We are simply noting that these examples of criticism are founded upon the assumption that the ideal of the law is to treat everyone alike and that the failure of the law occurs when this does not happen. There is an ancient adage to the effect that it is the glory of the common law that it is no respecter of persons, which has reference to the positions in life of the litigants, whether nobles or commoners.

So it is surprising to be told that the ambit of the ordinance should not embrace higher income people, but of course we grasp that there is a distinction intended by plaintiffs to take this case out of the general rule. Counsel does not clarify this distinction by analogy, but we might asssume that it is similar to saying that public assistance is not available to presidents of banks, which is an example of the law refusing help to those who do not need help. The banker does not require this contribution from the public treasury and the general welfare would not be served by augmenting his already ample funds. Which proves, we fear, only that arguing by analogy often leads to weird results. We prefer to turn the situation in reverse and ask what the public and legal reaction would be if the commission told people that it would not entertain their complaints because they had enough money to take care of their own troubles.

In this connection much more might be said but we shall restrict ourselves to one other comment. Prejudice is a fact which is conceded throughout this case beginning with plaintiffs' opening statement at the trial. It pervades all income groups of the white popu-

lation. Query: Can the many who live in the $10,000 neighborhoods be persuaded to change their attitude if the law does not touch the few who live in $35,000 neighborhoods? The question answers itself and the answer is "No" because there is involved here not only the principle of equality for whites under the law, but the magic word "status." In short, we cannot agree that the order of the commission in this case has no reasonable relationship to accomplish the purpose of the ordinance on the ground that it does not aid anyone in escaping from a slum or a ghetto. On the contrary, we cannot conceive of the lessening and final elimination of color consciousness unless it is attacked on a broad scale at all economic levels.

The final point in this three pronged attack on the order relates to its economic impact upon Stanton Land Company, which is claimed to be so disastrous that the harm to plaintiffs is disproportionate to the convenience of Doctor Nickens or to any contribution to the cause of integrated housing, and therefore constitutes a deprivation of property without due process of law. During the trial this issue led to deep and prolonged probing into the processes of the human mind in the form of testimony by expert witnesses and volumes of treatises which were introduced. The witnesses of course were in sharp conflict. The illustrious authors naturally are more objective and restrained in their pronouncements which are to a large extent based upon studies which employ as scientific an approach as the researchers have been able to devise. Separately and in the aggregate these authorities are informative sources of knowledge of the actual effect of integration upon the market value of real estate, but as might be expected they make various comments which are seized upon by counsel on both sides to bolster their respective views. Since it is clearly impractical to attempt to summarize the conclusions reached in this mass of learned exposi-

tion ranging from articles to full sized books,[1] we shall not focus upon any excerpts out of the complete context, but shall confine ourselves to this single observation, namely, that the best available data impressively undermines the prevailing thought among whites that integration in itself always, or almost always lowers the value of surrounding real estate.

At this juncture we refer back to our general discussion of constitutionality and we reaffirm our view that the claim of financial loss is irrelevant if the ordinance is valid, as we have found it to be. However, assuming arguendo, that ultimately this conclusion should not prevail, the financial question must be considered within the scope of the facts relating to this particular case, and to the extent that it matters, the burden is upon plaintiffs to show the special damage which entitles them to be exempted in this particular case from the clear general requirements of this law. So it is within this frame of reference that we comment on the claim of oppressiveness of the order.

This is not the simplest task with which we have ever been confronted, and absent the possession of omniscience, we are capable only of naming some of the factors in the situation which might reasonably be expected to influence the result, if any, of the presence

---

[1] For those who have more than a passing interest in the subject, they are: Laurenti, Property Values & Race, 1960; Glazer & McEntire, Housing and Minority Groups, 1960; Rapkin & Grigsby, The Demand for Housing in Racially Mixed Areas, 1960; Grier, Privately Developed Interracial Housing, 1960; McEntire, Residence and Color, 1960; City of Pittsburgh Commission on Human Relations, The Status of Housing of Negroes in Pittsburgh, November 1958; Advance Mortgage Corporation, Midwestern Minority Housing Markets, December 1, 1962; City of Pittsburgh Commission on Human Relations, The Status of Housing of Negroes in Pittsburgh, May 1962.

of the Nickens family in this plan of lots in a $35,000 home. We undertake this ratiocination influenced by all of the evidence but without analyzing separate items of it, because the evidence bearing upon this phase of the case is metaphysical and the art of dissecting pure philosophical concepts is said to have died with Immanuel Kant. And it might be added parenthetically that it may never really be proved whether we are right or wrong in our speculation of what would have happened in Stanton Heights, because the intervention of this very controversy itself has inordinately exaggerated the importance of the subject of speculation. The fact of a Negro family moving into the development after all of this furor is entirely different from the fact of this particular Nickens family moving into it unobtrusively in the ordinary course of events. It will take time for normalcy to reassert itself, and meanwhile other varying factors may influence the result such as the condition of the real estate market which is apparently plagued with some overproduction at this time. So before turning to the situation as it existed when the seeds of this dispute were sown, we cannot refrain from saying that the dispute itself is the thing which is most likely to be costly. This component of prevailing reality cannot now be eradicated, but it is our duty and purpose to analyze the other reality which obtained when Doctor Nickens' fateful glance encountered the Ryan advertisement. On the side of pessimism we had, of course, prejudice, which has been repeatedly mentioned, and hysteria in an unmeasured but substantial degree. These were general destructive forces, but there were also forces of hope and optimism which we believe would have conquered the forces of fear.

In the first place we have the personality of the Nickens family, an obstetrician on the staffs of leading hospitals, who is adjusted to interracial contacts, and

who has an attractive wife and daughters. Here we must unequivocally declare that physical characteristics, mental attainment and social position are not prerequisites to the enjoyment of human rights, but we are compelled to deal with the issues as they have been raised, and one of these issues is the compatibility of these people.

Another factor is the geographical location of Stanton Manor Plan. In this connection it is understood that neighborhoods have their own outward appearances which set them apart from surrounding neighborhoods and that this usually depends less upon proximity than upon topography, street pattern and architecture. However, this particular development is so close to integrated areas and to a proposed public housing project that it is reasonable to assume that its present and potential occupants would not be people with the strongest segregationist emotions. This hitherto undeveloped acreage lies in the midst of residential sections of varying character. Some parts are densely built with modest dwellings which are old and integrated or preponderantly nonwhite including those on streets which are natural approaches to the plan. Such an expansive island of vacant land existed as such and became available through the demise of the last remaining private golf course inside the city limits. A shopping center has been built at the site of the former clubhouse, which is intended to serve whites and nonwhites equally, and which adjoins one end of the subject residential area. In this setting people have been purchasing new homes of superior quality as fast as could be expected in view of general real estate activity since 1957.

With respect to these people who have been locating in Stanton Manor Plan, it is said that they have varying occupations and it is apparent that they are not underprivileged. In fact, it is reasonable to assume

that they are at least above average intelligence and thus knowledgable of the passing scene. For a number of years prior to 1957, and especially since 1954, a racial revolution has been surging over this nation; mostly peaceful, sometimes violent, but constantly noticeable. It has been likened to the colonial revolutions of the British and French Empires except that ours is fermenting within our borders and cannot be quieted by disgorging possessions or releasing the dissidents. Ours may never be terminated except by radical changes in deeply rooted mental habits. In any event it is here and everyone knows it is here. Everyone of reasonable understanding knows or should know that the ghetto arrangement of races is doomed and that the first portent of its eventual end will be in the movement of those who have the economic means of mobility, and not of those who are chained to their old habitats by poverty. So it seems inconceivable that most of those who have chosen to locate in this plan of lots, situated as it is, would have done so in the naive belief that they could not possibly have other than white skinned neighbors ever. This is putting the proposition mildly when one takes into account that the overwhelming majority of these residents elected to purchase after the passage of the ordinance, namely 30 of the 41 lot owners. People do not ordinarily risk their savings upon the assumption that a new law will be totally ineffective.

Not to be overlooked also is the combination which we have here of all new homes on spacious lots in a price range which has been reduced, but which is still out of reach of most people. The price factor is a basis for plaintiffs' dire forebodings of disaster under the logic, as previously noted, that the presence of a Negro family will discourage whites and will not simultaneously open a market for Negroes because so few of the latter have this kind of money. However, this

logic cuts both ways to some extent. There is a good deal of expert opinion to the effect that a deep concern of the whites is that they will be overwhelmed by residential integration and that they do not object so strongly to the racial mixture if they are assured that they will remain in the majority. We are impressed by this theory, and if it is valid, the level of income of Negroes in Pittsburgh should tend to assure the perpetuation of a large white majority in a new and expensive plan.

This apprehension of the whites that they will be out-numbered is a psychological phenomenon which is a powerful barrier to racial acceptance and it is accompanied by the additional fear that the housing will become crowded and dilapidated. They regard this as inexorable because they have seen so much population movement of this sort and so many Negroes living in substandard physical conditions. To the mind which is untrained in sociology it is normal to equate things which coexist in an environment as cause and effect, and to conclude erroneously that the ethnic characteristics of the inhabitants ipso facto produce their own milieu. We shall not attempt to add to the extensive literature which deals with this unfortunate misunderstanding since we are not really concerned here with what happens in the midst of a sea of poverty, but only with what happens at higher economic levels. As to the latter there are plenty of examples of Negroes entering white neighborhoods and living there for years without being joined by more Negro families and without any outward sign that they are there. All of the houses are well kept and the vacancies are consistent with normal turnover. This is not to insist dogmatically that the contrary does not also happen or to estimate the percentage of instances one way or the other. To attempt this would be speculative. Nor can we guess at the degree of contentment of those involved in the

situations where such slight integration continues un-
eventfully as such.

We learn from the empirical observation of the spec-
cialists that these more or less successful and tranquil
incidents of integration are aided by the sensation of
relief which the white residents experience after the
fact of mixed association compared with the awful
fears of anticipation which beset them beforehand.
Things sometimes turn out so well compared with what
they expected that they could now be complete converts
to the principle of equality except for one obstacle
which the unexceptional person cannot surmount and
that is the uneasiness he feels about his social standing
as reflected by his place of residence. Maybe no one
should be condemned for this uncertainty since it is
an almost universal mental affliction. Its existence is
recognized by counsel for plaintiffs in arguing that
forced integration cannot succeed unless it takes place
in all localities to some extent. While we agree with
this, we cannot comprehend how any venture can be
pursued without starting somewhere, and this sort of
venture does not seem to get moving without the sanc-
tions of law as witness the integration of public
schools. Granting that the pace of the latter has been
disappointing in the ten years since the Supreme
Court order, it is still better by every single student
enrolled than it was for the preceding 90 years. It may
be the same way with housing and it may not come
about without turmoil. In fact, we have had some of
this in Pennsylvania already.

Related to the assumption that few Negroes can af-
ford to purchase in Stanton Manor Plan is the corollary
thought that these few are quite likely to be educated.
It is our impression that a number of well educated
whites are represented in the plan at this time. This
may help. An expert witness for plaintiffs said that
racial prejudice is even more rampant among educated

persons, while at least one expert for defendants stated the contrary. Our impression is that plaintiffs' expert, who is a realtor, may be confusing education with material success to some extent. There are many people, possibly a majority, who acquire degrees as a means to an end, and there are those who get degrees as a by product of learning. There are the formally educated and there are the intellectuals. The latter are less bothered by feelings of insecurity and by the compulsion to conform to social attitudes. They accept integration more calmly for this reason. As an example of what we mean by this we might take the very man who started all this commotion. Abraham Lincoln had practically no regular schooling, yet his education was extraordinary. Certainly he was one of the great intellectuals of our history, although the one derogatory epithet which he escaped was the term egg head which had not yet been coined. And it may be worth mentioning that Lincoln's pronouncement of the necessity of unification of our people was a judgment of reason, not of emotion, and the prediction that "a nation divided against itself cannot stand," if valid at all, is still valid today. Lincoln also was calmly contemplative and not one to rush things and he was acutely aware of the frailties of mankind, but we imagine that he would have expected greater progress down the path of fraternity which his brilliance lighted than has been accomplished in the 100 years since the Emancipation Proclamation.

One final word as we come to the end of our discussion, and this is to comment on plaintiffs' offer to sell lot 271 to Doctor Nickens if the transaction might be delayed for 18 months. This proposal for settlement apparently was made in conversation of counsel when the commission was considering the complaint and it would not ordinarily be admissible but it was brought into the case voluntarily and is used by way of argument in

plaintiffs' brief. It raises the question of whether plaintiffs are themselves positive that they will lose all if the Nickens family moves into the Plan. At the rate with which the sales of lots were proceeding prior to the mention of a Negro purchaser, the few which might be disposed of in 18 months would not be a very significant percentage of the total which will be available upon complete development. So, assuming that plaintiffs would not deem it sensible to commit financial suicide even for the sake of legal tranquillity, it is possible that plaintiffs are fighting primarily to avoid the bruising of the ego which accompanies capitulation. That is to say, there may be some stubbornness on both sides. However this is more of a question than an assertion on the part of the chancellor.

One thing is certain; that this litigation will accomplish approximately the same postponement if it is pursued on appeal. A large part of this delay is unavoidable because it is inherent in the Equity Rules of Civil Procedure.[2]

But whenever this case comes to its end, be it early or late, let us hope that what is here transpiring will contribute something ultimately to the cause of human understanding.

---

[2] The avoidance of additional delay is responsible in part for the unusual—although not unprecedented—position of the writer as chancellor in this case. Three of my colleagues and I sat during July on a summer equity list and the case happened my way. Having informed the lawyers that I had voted to enact the ordinance and also that I have been well and favorably acquainted over the years with Francis X. Totten and his family, I waited hopefully but in vain for a suggestion that I disqualify myself. The reaction was to the contrary. The circumstances were such that none of the other three judges could reasonably be asked to relieve me of this duty and the next equity trials were almost four months away. In this situation it seemed appropriate to be guided by the precept of ex President Truman, recently quoted with approval by Governor Scranton; viz., "If you can't stand the heat, stay out of the kitchen."

## Conclusions of Law

1. Equity has jurisdiction of this case.

2. The City of Pittsburgh's Fair Housing Ordinance No. 523 of 1958 is a valid enactment within the authority conferred upon the city by law.

3. The Fair Housing Ordinance is constitutional, generally and in its application to the facts of this case.

4. The burden of proof to establish violation of ordinance no. 523 in a "de novo" proceeding following an adjudication and order of the Commission on Human Relations is on the City of Pittsburgh.

5. Plaintiffs violated the Fair Housing Ordinance in refusing to sell lot no. 271 in the Stanton Manor Plan no. 2A to the intervening defendant.

6. The enjoining of plaintiffs to cease violation of the Fair Housing Ordinance, and to comply with it, is necessary and proper.

## Decree Nisi

And now, November 30, 1963, in accordance with the foregoing findings of fact and conclusions of law, it is ordered, adjudged and decreed that:

1. Plaintiffs Stanton Land Company, a corporation, and Francis X. Totten, cease and desist from violating the Order of the Commission on Human Relations of the City of Pittsburgh of January 24, 1963, and ordinance 523 of 1958 of said City in refusing to sell lot 271 in Stanton Manor Plan 2A to Doctor Oswald J. Nickens; and that

2. Plaintiffs Stanton Land Company, a corporation, and Francis X. Totten, its president, sell and convey lot no. 271 in Stanton Manor Plan 2A to Doctor Oswald J. Nickens upon payment for same in accordance with the customary routine whereby Ryan Homes, Inc., builds houses in Stanton Manor Plan.