NANCY J. CAMPBELL, administratrix,[1] *vs.* ROBERT SCHWARTZ
& another.[2]

No. 97-P-2105.

Suffolk. April 15, 1999. - July 21, 1999.

Present: PORADA, LAURENCE, & SPINA, JJ.

*Practice, Civil,* Summary judgment. *Statute,* Construction. *Negligence,*
Snowmobile, Wrongful death. *Words,* "Rescue."

In a wrongful death action, a Superior Court judge correctly concluded on
motions for summary judgment that the defendants, as matter of law, were
engaged in "rescue assistance," as that term is found in the Maine "Good
Samaritan" statute, Me. Rev. Stat. Ann. tit. 14, § 164, applicable to the
circumstances, with the result that the defendants were immune from li-
ability under the statute. [363-366]

CIVIL ACTION commenced in the Superior Court Department on
April 26, 1995.

The case was heard by *Peter M. Lauriat,* J., on motions for
summary judgment.

*Daniel C. Crane* for the plaintiff.

*Peter A. Palmer* for Robert Schwartz.

*Edward L. Kirby, Jr.,* for Robert Gemler.

PORADA, J. The principal issue in this case is whether the
Maine "Good Samaritan" statute[3] bars the plaintiff's claims for

---

[1] Of the estate of John Campbell.

[2] Robert Gemler.

[3] Maine Rev. Stat. Ann. tit. 14, § 164 (West 1980), provides in pertinent
part as follows: "Notwithstanding any inconsistent provisions of any public or
private and special law, any person who voluntarily, without the expectation
of monetary or other compensation from the person aided or treated, renders
first aid, emergency treatment *or rescue assistance* to a person who is
unconscious, ill, injured or *in need of rescue assistance,* shall not be liable for
damages for injuries alleged to have been sustained by such person nor for
damages for the death of such person alleged to have occurred by reason of
an act or omission in the rendering of such first aid, emergency treatment or

wrongful death and conscious pain and suffering against the defendants. A Superior Court judge allowed the defendants' motions for summary judgment on the ground that it did. The plaintiff appeals, contending that disputed issues of fact precluded the allowance of summary judgment and that the judge erred in concluding as matter of law that the defendants were engaged in rescue assistance at the time of the accident which resulted in the death of the plaintiff's husband. We affirm.

We summarize the pertinent facts, which do not appear to be in dispute. While in northern Maine, on the evening of January 16, 1994, at about 10:00 P.M., the plaintiff's husband, John Campbell, the defendant Robert Schwartz, and Pat Haddigan decided to return on their individually-driven snowmobiles from the Medawisla camp, where they had been visiting friends, to the Kokadjo camp, where they were staying. The distance between the two camps was at least eight miles.[4] Before leaving, Schwartz called the owners of the Kokadjo camp, Fred and Marie Candeloro, to let them know they were on their way back. Haddigan drove the lead snowmobile, Schwartz followed him, and Campbell brought up the rear. Although it was their practice to stop several times to make sure that each of them was all right, they decided not to do so that night because the temperature was around twenty degrees below zero. The first one to arrive back at the Kokadjo camp was Haddigan; Schwartz followed some five minutes later. Schwartz told Fred Candeloro that Campbell was right behind him. However, when Campbell didn't arrive some twenty minutes later, Schwartz said he was going out to look for him. The defendant Gemler, who had been doing some work for the Candeloros at the camp, volunteered to accompany him because he thought it was too cold for Schwartz to go out alone. Both Gemler and Schwartz were aware that Campbell had been drinking during the day. Candeloro said that they could use his snowmobile, but he did not want Gemler to drive it. As a result, Gemler, who had no experi-

rescue assistance, unless it is established that such injuries or such death were caused willfully, wantonly or recklessly or by gross negligence on the part of such person." (Emphasis supplied.)

The parties do not dispute that the substantive law of the State of Maine is determinative of the defendants' liability to the plaintiff.

[4]By Schwartz's estimate, the distance between the two camps was fifteen to twenty miles, and by Fred Candeloro's estimate, the distance was eight miles.

ence driving a snowmobile, drove Schwartz's snowmobile and Schwartz drove Candeloro's snowmobile. After traveling some four to six miles in Schwartz's opinion (but he also guessed it could have been more like two or three miles), they found Campbell approximately one-quarter of a mile from the trading post store.[5] When they arrived, he was trying to start his snowmobile, which had broken down. Schwartz attempted to start Campbell's snowmobile and did manage to do so, but it stalled after being driven about one hundred feet. Because it was so cold and Campbell had been out in the cold for some time before Schwartz and Gemler reached him, Schwartz apparently made the decision to leave Campbell's snowmobile behind and return to the Kokadjo camp. Instead of driving Candeloro's snowmobile, Schwartz got on his own snowmobile. Campbell already had seated himself on the back of Schwartz's snowmobile, even though that snowmobile was not designed to carry a passenger. Gemler was left to drive Candeloro's snowmobile. Schwartz instructed Gemler to drive straight down the road behind him. Gemler did so but had trouble seeing to the other side of the road because of blowing snow. After traveling at least 600 feet, Schwartz realized that Campbell was no longer on the back of his snowmobile, and he stopped.[6] When Gemler saw Schwartz standing beside his snowmobile, he also brought his snowmobile to a halt. Schwartz told him that Campbell had fallen off. At that time, Gemler said he had struck something in the road which he thought was a log. Upon checking, they found Campbell unconscious on the road. Gemler checked Campbell for a pulse but could find none. Campbell never regained consciousness and was pronounced dead at the hospital. When Campbell's blood alcohol level was tested, it registered .34, four times the legal limit in Maine. The police report prepared by the investigating officer attributed Campbell's death to Gemler's inexperience with a snowmobile; Schwartz's decisions to let Campbell ride on the back of his snowmobile rather than on the Candeloro snowmobile, which was designed to carry a passenger, and to return by the plowed road instead of the snowmobile trail to the Kokadjo camp, al-

[5]From the record, it is unclear where the trading post store was in relation to the Kokadjo camp.

[6]Schwartz recollected that he had traveled one-half mile before realizing Campbell had fallen off the snowmobile. The police report indicated that the distance was approximately 600 feet.

lowing for greater speed; and Campbell's inability, because of his intoxication, to have the necessary motor function to stay on Schwartz's snowmobile.

In depositions presented to the motion judge, Candeloro expressed the opinion that he did not consider Schwartz's and Gemler's original decision to search for Campbell a rescue mission but a "cautious mission." He saw no need, when Schwartz and Gemler departed, to mount a search party or call for emergency aid, because from what Schwartz had told him, Campbell was not that far out from the camp, and Schwartz was capable of finding Campbell because of his familiarity with the trails. However, Candeloro further testified that knowing now that Campbell's snowmobile was inoperative when he was found changed his opinion about the nature of the mission. He also testified that he would not, in twenty degrees below zero weather, send just one snowmobile out to look for someone but would send two out in case one broke down. Warden Roger Guay, who investigated the accident for the local police, testified in his deposition that when Schwartz and Gemler set out to look for Campbell, he did not consider that Campbell's absence at that time presented a life-threatening situation. It was not uncommon for a snowmobile operator to get lost for an hour or so, and the seriousness of the situation depended on the preparedness of the operator for this eventuality. In Warden Guay's opinion, when one is stranded alone in cold weather, with an inoperable snowmobile, and is legally intoxicated, those circumstances would create a potentially life-threatening situation. Guay also was of the opinion that, for purposes of safety, a search party should consist of two separate snowmobiles and operators.

The plaintiff does not controvert these facts but argues instead that the determination of the legal significance of these facts was a question of fact and not of law. She further argues that the deposition testimony of Candeloro opining that Schwartz's and Gemler's decision to look for Campbell was simply investigatory, and Guay's testimony that he did not consider a life-threatening situation to exist when a snowmobile operator is missing for an hour in very cold weather, would support a finding that Schwartz and Gemler were not engaged in a rescue mission. The plaintiff's argument overlooks two material points. First, summary judgment is appropriate when the material facts are not in dispute and as matter of law their legal significance

warrants a decision for one party or the other. *McHerron* v. *Jiminy Peak, Inc.*, 422 Mass. 678, 679 (1996). *All State Ins. Co.* v. *Reynolds*, 43 Mass. App. Ct. 927, 928 (1997). Second, the argument overlooks other testimony of Candeloro and Guay. Candeloro testified that his opinion about the nature of Schwartz's and Gemler's mission changed once they found Campbell and discovered that his snowmobile was inoperable. Guay testified that if the operator was intoxicated, his snowmobile inoperable, and the temperature twenty below, a life-threatening situation existed. This is, therefore, not a case where the fact finder could draw opposite inferences from the evidence presented. Cf. *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 811-812 (1991). While we agree with the plaintiff that the judge's reliance on "substantial evidence" in ruling that the defendants were engaged in a rescue mission is not the proper standard to apply, see *Riley* v. *Presnell*, 409 Mass. 239, 244 (1991), we nevertheless conclude that the on the record presented there were no material facts in dispute.

We now address whether those facts demonstrated that the defendants were engaged in rescue assistance at the time of the accident. The plaintiff argues that in order for the defendants to have engaged in rescue assistance, Campbell had to be in imminent peril or danger, and such was not the case when Schwartz and Gemler found him. The word "rescue" is not defined in the statute. Nor has the statute been subject to interpretation by the Supreme Judicial Court of Maine. Nevertheless, applying the usual maxims of statutory construction, the Supreme Judicial Court of Maine has held that in the absence of a legislative definition, "the plain meaning of the term controls." *State* v. *York*, 704 A.2d 324, 326 (Me. 1997). Also, the meaning ascribed to the term must be "consistent with the overall statutory context and must be construed in light of the subject matter, the purpose of the statute and the consequences of a particular interpretation." *Reagan* v. *Racal Mort., Inc.*, 715 A.2d 925, 927-928 (Me. 1998), quoting from *Madison* v. *Norridgewock*, 544 A.2d 317, 319 (Me. 1998).

"Rescue" as used in ordinary parlance means "to free from . . . danger." Webster's Third New Intl. Dictionary 1930 (1993). Danger is defined as "the state of being exposed to harm." *Id.* at 573. Applying these definitions, the judge properly held that where one's whereabouts is unknown in rural Maine, late at night, in temperatures registering twenty degrees below

zero, a search for that individual constitutes a rescue. His conclusion is bolstered by the subject matter of the Good Samaritan statute. The immunity bestowed by its terms is conferred on persons rendering "first aid, emergency treatment or rescue assistance" to persons who are "unconscious, ill, injured or in need of rescue assistance." There is, thus, nothing in its subject matter which limits rescue assistance to situations of imminent peril or harm. Rendering aid to someone who is ill does not necessarily imply imminent peril or harm. Nor is there anything in the statute's limited legislative history which suggests that it was so intended. Its express purpose was "to provide immunity from civil liability to all persons who voluntarily render first aid, emergency treatment or rescue assistance to persons in need of it and to repeal the present provisions of the statutes which provide such immunity to the more limited groups of ski patrols, licensed ambulance personnel, physicians and nurses." Legislative Document No. 1910 & H-604, Enacted Laws of Maine 1975, c. 452. Finally, while most Good Samaritan statutes limit the immunity from ordinary negligence to individuals voluntarily providing *emergency care*, see Annot., Construction and Application of "Good Samaritan" Statutes, 68 A.L.R.4th 294, 299-300 (1989), the Maine Legislature's use of the term "rescue" in place of "emergency care" suggests that the Legislature intended that the statute have a broader reach, thus fostering and encouraging aid among the populace not only to persons in imminent peril or harm but also to persons exposed or vulnerable to harm or injury. Contrast Me. Rev. Stat. tit. 30-A, § 456 (West 1987): "Each county may provide rescue services [defined in § 451 as "those services required to free or save persons from imminent injury or death due to accidents or other emergencies"] through the sheriff's department and deputies."

In sum, we conclude that the motion judge properly determined that Gemler and Schwartz, as matter of law, were engaged in rescue assistance when they went looking for Campbell. A search for an intoxicated person who is missing in rural Maine, late at night, with temperatures registering twenty degrees below zero, certainly constitutes a rescue mission. See *Barnes* v. *Geiger*, 15 Mass. App. Ct. 365, 371 (1983). Although the judge did not specifically address the duration of the rescue mission, we conclude that the rescue did not end when Schwartz and Gemler found Campbell on the trail with an inoperable

snowmobile. Given his state of intoxication, the temperature, the hour, the inoperative condition of his snowmobile, and the apparent necessity for two operable snowmobiles, they were likewise engaged in rescue assistance when they sought to return him to the Kokadjo camp.

*Judgments affirmed.*